**Joye Stanford NALLS, Appellant,**

v.

**UNITED STATES of America,**
Appellee.

No. 15986.

United States Court of Appeals
Fifth Circuit.

Jan. 31, 1957.

G. Hume Cofer, John D. Cofer, Austin, Tex., for appellant.

---

2. 60 Stat. 444 (1946), repealing 33 Stat. 729 (1905).

Herman Parrott, San Antonio, Tex., Russell B. Wine, U. S. Atty., San Antonio, Tex., for appellee.

Before CAMERON, JONES and BROWN, Circuit Judges.

CAMERON, Circuit Judge.

The defendant, Joye Stanford Nalls, was convicted and sentenced to pay a fine and to serve two years imprisonment under an indictment charging that he knowingly and wilfully acquired twelve grains of marihuana without having paid the transfer tax imposed by law. He appeals contending that the evidence introduced by the Government was not sufficient to establish the crime, that certain statements made in the presence of the jury by the prosecuting attorney were improper and prejudicial and that a statement by one of the arresting officers that he held a pick-up order for the defendant was likewise prejudicial.[1] We think that the evidence presented was sufficient to make out a case for the jury, but that it was a weak case and that, under the peculiar circumstances prevailing here, the statement of the prosecuting attorney and the volunteered response of the witness were prejudicial, requiring a reversal.

At the time of the arrest of the defendant and seizure of the substance which proved to be marihuana, defendant was driving his brother's car en route home from visits to two night clubs, Hudson's and The Wagon Wheel. Evelyn Williams (now Pledger) was riding on the front seat with him, and Bill Woods and Phillis Arnette (now Wagner) were riding on the back seat. Austin Texas Police Officer Scott was trailing defendant's car and he "saw an occupant in the back seat of the vehicle he was in bend down and place something towards the floor * * *." He stopped defendant, engaging him in conversation, at the same time instructing other police officers who showed up by prearrangement to "check the automobile in the back seat to see what the subject had put on the floor." Upon making the search Police Officer Renck found two match boxes which had been pushed between the right edge of the back seat and the side of the car. As he removed the back seat these two match boxes dropped to the floor.

Officer Scott took the defendant into his car, driving him to the police station, and on the way told defendant, whom he had placed under arrest, and in response to defendant's question as to "what that was I got out of the back of his car," that "it was two penny match boxes that had some substance in them." Officer Scott, who had received the two match boxes from Officer Renck, took them out of his pocket and exhibited them to Nalls. Defendant stated that he knew nothing about one of them, but said the other was his. This statement was made after Officer Scott had expressed the opinion that the boxes contained marihuana. Substantially the same statement was made by defendant to another police officer some twelve or more hours later.

The only proof that defendant had ever possessed either of the match boxes was given by Phillis Arnette, whose story was to this effect: She and Evelyn Williams had gone, in company with defendant, in the early evening of February 27th, 1954, to a night club where Bill Woods worked as a member of the band. They stayed around there several hours until Bill's workday was over, which was near midnight. She and Bill Woods then got into defendant's car with him to visit another night club, all riding on the front seat of the car with her in the middle. On the way between Hudson's and The Wagon Wheel, Nalls handed a penny match box to Bill, saying

1. Defendant contends, also, that the Internal Revenue Code of 1939, under which defendant was prosecuted, had been superseded by the Internal Revenue Code of 1954; and that the Court below wrongfully charged the jury in defining the meaning of "knowingly" and "wilfully". The disposition we make of the appeal makes it unnecessary to decide those questions which we assume will not recur in another trial.

nothing. Phillis intercepted the box,— "So I took it and I put it down in my bra * * * [and] kept it there until we went to The Wagon Wheel."

Sometime after arriving at The Wagon Wheel where Ethel was with another party, Phillis went alone into the ladies' restroom and took out the match box and opened it. There was a substance resembling tea in it, and she did not know what it was. Finding another match box on the lavatory, she opened it and poured some of the contents of the one she had been possessing for sometime into the new-found box, installing the two boxes safely back in the same feminine sanctuary. Apparently no word was spoken between any of the four concerning either match box or the contents. Finally, the four of them entered defendant's car to go home. It was then that the officers made their appearance with the results above narrated.

Called as a witness, Phillis stated, in response to a question as to what she did with the boxes when "the cops stopped us": "I started to give them *back to Bill* before that and he wouldn't take them, so I put them down beside the seat." (Emphasis added.) She later stated that she "tried to give it to him, and he didn't take it."

This rather bizarre story told by the young lady is not free of inconsistencies and contradictions. Although she testified that she held possession of the match boxes during the whole period after she intercepted one of them, she stated spontaneously that, when the cops showed up she gave them *back* to Bill Nobles and he would not accept them. Her clandestine transfer of part of the contents of the first box to the second, her frantic effort to get rid of them when the cops appeared, and the refusal of Bill Woods

to have anything to do with them followed by her act in secreting them, are inconsistent with her statement that she had no idea what was in the boxes.

The movement seen by Officer Scott as he drove close behind defendant's car prior to accosting defendant was the movement of a *man* towards the floor— it was this movement which caused the officer to be suspicious. This does not jibe with Phillis' testimony; and the unreasonableness of her story and the circumstantial contradictions tend to depreciate considerably the probative value of her evidence.

There was no direct testimony at all that defendant ever "acquired" the substance in the match box in contravention of the Tax Statute, and the only proof tending to establish these crucial facts is that defendant "possessed" marihuana which, if and when proven, raises the presumption that it had been acquired without payment of the tax in violation of the statute.[2]

The Government's proof was sufficient to establish a jury case, but it is a weak case. A verdict based on it ought to stand only if the Court can be reasonably sure that the testimony was weighed by the jury in an atmopshere free from bias. But the Court cannot be sure of this in the face of the two episodes mentioned above.

As the Government's proof was concluded, its attorney stated in the presence of the jury: "We have three other witnesses, one by the name of Ethel Pledger, and also Robert Ligon and Earl A. Stewart who have been subpoenaed by the Government. At this time we tender those witnesses to the Court and the attorney for the defendant. The reason the Government will not put them

---

**2.** The Court so charged the jury. The presumption is created by 26 U.S.C.A., 1954, § 4744(a) (and cf. 26 U.S.C.A.1939, § 2593(a):

"It shall be unlawful for any person who is a transferee required to pay the transfer tax imposed by section 4741 (a) to acquire or otherwise obtain any marihuana without having paid such tax;

and proof that any person shall have had in his possession any marihuana and shall have failed, after reasonable notice and demand by the Secretary or his delegate, to produce the order form required by section 4742 to be retained by him shall be presumptive evidence of guilt under this section and of liability for the tax imposed by section 4741(a)."

on, we feel that their testimony might tend to be cumulative, and we do not care to—." [3]

■ It is difficult to find any justification for what was said and done by the Government's attorney. In an adversary proceeding wherein the court is a disinterested arbiter, it is without point to tender the witnesses to the court. The explanation is made that the Government wanted to escape the presumption sometimes attending failure to offer witnesses within the easy reach of a litigant.[4] But the procedure followed would not have any tendency to exonerate the Government from whatever adverse presumptions might follow failure to put the witnesses on the stand. Such a presumption arises from failure to *use* a witness,—not failure to bring him to court.

Moreover, such a procedure is inherently unfair to the defendant. If the Government's counsel wanted to advise defendants that the witnesses were available, he could have done so privately.[5] To proffer the witnesses before the jury under the circumstances here disclosed is to challenge the defendant to use them, or to risk the probability that the jury will hold it against him if he fails to put them on the stand. The statement of the Government Attorney also essayed to vouch for the content of the testimony of the unused witnesses as corroborating that already produced. He immediately acknowledged that said statement "was wrong", and the Court seemed disposed at first to exclude it. But when defendant asked that the jury be instructed to disregard it, the Court refused.

An unresponsive statement was volunteered by City Policeman Scott for which the Government was not responsible. When asked what he did when he first saw defendant, the officer replied: "Our Department carried a pick-up on him on a warrant held by the sheriff's office." The Court, upon objection and request, stated: "I believe at this stage of the proceeding I will sustain the objection and instruct the jury not to consider that remark." A mistrial was promptly asked and refused. We think that this statement was calculated to influence the thinking of the jury and was likely to induce prejudice, just as was the statement made by the attorney in closing the Government's case. It is difficult to conclude that such occurrences were not likely to have a bearing on the jury's verdict. Cf. Paramount Film Dist. Corp. v. Applebaum, 5 Cir., 1954, 217 F.2d 101, and Texas & New Orleans R. Co. v. Un-

---

3. Immediately following the quoted statement this colloquy occurred:

"Mr. Cofer: We object to the statement of the District Attorney that he has any additional testimony to corroborate the witnesses' testimony.

"The Court: You will disregard the statement of the District Attorney in reference to the matters just mentioned.

"Mr. Parrott: Your Honor, those witnesses are here. I am sorry I was wrong, but they are here.

"Mr. Cofer: We object to the continuance—the Government has got the right to offer any testimony they have got.

"The Court: I will overrule that last objection.

"Mr. Cofer: We except to the statement of the District Attorney that he has got any testimony that he is not offering to this Court.

"The Court: I understand your exceptions.

"Mr. Cofer: We ask the Court to instruct the jury to disregard that.

"The Court: I refuse to do that.

"Mr. Cofer: We except.

"Mr. Parrott: With that, the Government rests."

4. Cf. Graves v. United States, 1893, 150 U.S. 118, 121, 14 S.Ct. 40, 37 L.Ed. 1021; Local 167, of Int. Brotherhood of Teamsters, etc., v. United States, 1934, 291 U.S. 293, 54 S.Ct. 396, 78 L.Ed. 804; Williams v. United States, 5 Cir., 1952, 199 F.2d 921; Anderson v. United States, 5 Cir., 1950, 185 F.2d 343; and United States v. Roberson, 5 Cir., 1956, 233 F.2d 517.

5. Or if the Government were about to be put in an undeservedly unfavorable position, it could put on witnesses, subject to cross-examination, to justify its failure to produce a witness. Cf. Shurman v. United States, 5 Cir., 1956, 233 F.2d 272, 273.

derhill, 5 Cir., 1956, 234 F.2d 620, and the cases therein cited.

Where the evidence is fully developed and makes out a clear case, such episodes as those here discussed would probably not warrant setting aside the jury's verdict and the Trial Court's discretion. " * * * if an interested party tells an improbable story, the absence of corroborating testimony of witnesses, who, it appears, were cognizant of the fact, will weigh heavily against him. However, the unexplained absence of a witness who might have given corroborating evidence will not impair a strong case made out by satisfactory evidence." 20 Am.Jur., Evidence, § 188, p. 193.

█ In a case such as the one before us, where the evidence is unsatisfactory and not fully developed, and the showing barely justifies submission of the issues to the jury, a court should be quite zealous in insuring that the jury is not influenced towards its verdict by any prejudicial testimony or conduct.[6] We had before us a situation not unlike this one in Brown v. United States, 5 Cir., 1953, 202 F.2d 474, 476, where a witness had given an unresponsive answer and the Trial Court had instructed the jury to disregard it. Even so, we thought the answer, taken with other like happenings, sufficient to require reversal in a marihuana case. And we find the same thing to be true here. Cf. also, Wardlaw v. United States, 5 Cir., 1953, 203 F.2d 884, and Rent v. United States, 5 Cir., 1954, 209 F.2d 893.

For the reasons stated, the judgment of the Court below is reversed and the case is remanded for another trial.

Reversed and remanded.

6. e. g. In Carter v. United States, 5 Cir., 1956, 231 F.2d 232, 236, we considered similar remarks of the United States Attorney not sufficiently prejudicial to warrant reversal, but to be within the discretion of the trial judge *"to handle with*

*appropriate instruction."* [Emphasis added.] The situation here is different: the Court below refused to instruct the jury to disregard the attorney's remarks; and that case was a strong one while this is not.