Sydney GINSBERG, Appellant,

v.

UNITED STATES of America, Appellee.

No. 16544.

United States Court of Appeals Fifth Circuit.

June 30, 1958.

Cameron, Circuit Judge, dissented.

Arthur B. Cunningham, Philip T. Weinstein, Daniel L. Ginsberg, Miami, Fla., for appellant.

O. B. Cline, Jr., Asst. U. S. Atty., James L. Guilmartin, U. S. Atty., Miami, Fla., Charles K. Rice, Asst. Atty. Gen., Joseph M. Howard, Atty., Washington, D. C., for appellee.

Before CAMERON, JONES and BROWN, Circuit Judges.

CAMERON, Circuit Judge.

The appellant, Sydney Ginsberg, was convicted and sentenced on two indictments, consolidated for trial by the court, charging income tax evasions under § 145(b) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 145(b), for the years 1946, 1947 and 1948. The tax evasions charged and established by the Government's evidence were based upon specific omissions of income received.

The appellant was engaged in the wholesale purchase and sale of used automobiles in Miami, Florida, conducting some operations individually, others in partnership with his brother and others as an official of Nash Miami Motors, Inc. The proof of the Government, as presented by its attorney's final argument, showed that appellant had participated in the sale of 392 used cars during the years

involved, and that he caused the books of the businesses in which he was engaged to reveal that a total of $224,958.56 had been received therefor, whereas the books of the purchasers of the cars showed that the amount received was $331,-915.06, resulting in a tax evasion aggregating $106,976.50.

The Government placed upon the stand several witnesses who testified that their concerns had paid appellant the amount shown on his books as having been received, but had made additional payments "under the table" to appellant which did not appear on the books.

Appellant took the stand and denied categorically each and all of the statements of these witnesses, but the jury resolved these issues against him, convicting him on both counts of one indictment and one count of the other. He appeals from the judgments based thereon and raises, upon this appeal, six questions which are properly covered by specifications of error.[1] We find no merit in the issues discussed under questions 1, 4 and 6 as set forth in Footnote 1. Appellant's argument in his answers to questions numbered 2, 3 and 5, however, convinces us that the convictions should be reversed and the cases tried again.

█ Under his question No. 2, appellant presents the issue whether the admission of evidence concerning deposits made in a joint bank account of the appellant and his deceased brother, was prejudicial error. Appellant and this brother had been engaged in other businesses besides the used car business, including dealing in real estate in various cities. While appellant was on the witness stand, the attorney for the Government questioned him at length concerning a number of individual deposits appearing in the joint bank account, some of them of large amounts of money. The Government had made a detailed examination of appellant's books and apparently had full information concerning those items. But appellant was clearly taken by surprise and was wholly unable to explain the source of some of the amounts shown on the account after the lapse of some eight years between the deposits and the time of trial. One item covered a deposit of $40,000.00 in the year 1947, and the Government's attorney asked if the deposit was not made

<hr>

1. His brief thus states these questions:

1. "Did not the trial court err in refusing to grant a new trial (1) where the trial court on different occasions made conflicting statements as to whether or not two of the jurors, during the jury's deliberations had come to his chambers to consult about the case, and (2) subsequent evidence showed, on at least two occasions during deliberations, certain of the jurors separated from the others, one separation of which was unexplained, and the presumption of prejudice arising therefrom was unrebutted by the government?"

2. "Where in a tax evasion case the government relied upon the theory of specific omissions of income from sales of automobiles, was it not plain and prejudicial error for the trial court to permit the United States Attorney, over objections, to question the appellant concerning a deposit of cash, made in a joint bank account of the appellant and his deceased brother, and to make an inflammatory and prejudicial argument to the jury on such inadmissible evidence?"

3. "Did the trial court commit prej-

udicial and reversible error by (1) denying appellant's motions for discovery and inspection, and quashing a subpoena duces tecum, and (2) denying a motion for new trial on newly-discovered evidence which evidence would have been available to appellant at the time of trial had the trial court granted appellant's motions for discovery and inspection?

4. "Did the trial court err by refusing specifically to instruct the jury on appellant's principal defense?"

5. "Did the trial court commit plain error by permitting the United States attorney apparently to argue as if he were testifying as to facts within his special knowledge as such United States attorney:

"(a) That he could have had 'fifty' people to show the appellant is not of good character, and

"(b) As to why the government sought to prosecute Nash rather than R. S. Evans?"

6. "Did the trial court commit plain and prejudicial error in that one portion of his charge had the effect of directing a verdict against the appellant?"

in currency and the form of his questions assumed that such was the case. But appellant was never able to answer the questions concerning the source of this money.[2]

Another item was a deposit of $10,000.00, which the Government attorney also indicated had been made in currency. Appellant was later able to trace this $10,000.00 to his brother. After utilizing a recess of several days in the trial for investigation, appellant testified to the probability that the $40,000.00 had been deposited by the brother based upon his discovery that a short time thereafter, the brother withdrew from the account $52,000.00 for the purchase of a home.

The Government attorney made full use of appellant's inability to explain adequately these large deposits, as is illustrated by the excerpt from his argument copied in the margin.[3] Appellant sought to soften the impact of this testimony by requesting an instruction,[4] which the trial judge marked "Refused" over his signature.

We think that the admission of this evidence, compounded by the prominence given it in the argument, and the refusal of the requested instruction constituted prejudicial error under our recent decision in Blumberg v. United States, 1955, 222 F.2d 496. That was a case involving also specifically accounted for income which had not been reported, and we held that it was improper to admit proof that Blumberg's wife had spent money lavishly on a wedding of a member of the family in New York and that she had taken

2. Appellant objected to one question along this line in these words: "If the Court please, I think that is entirely immaterial. There is nothing in the evidence that it was made in cash, only the statement of the District Attorney." The objection was overruled by the trial court, and the attorney kept pressing the appellant as to where such an amount of currency came from.

3. "One of my last questions to Mr. Ginsberg was with respect to the $40,000 cash deposit in the bank account known as C & S bank account, here in the First National Bank. A $40,000 cash deposit. Now, that was Friday at 1 o'clock. Have you ever seen a ship flounder at sea? Have you ever seen somebody immediately taken by surprise? I am sure you noticed his demeanor on the stand and how hopelessly he looked. He answered that it was for a piece of property that he sold. I said, 'All right, show us on your income tax return for 1947 where you sold a piece of property.' He looked, and he did not find it. And he stated that he remembered that in 1948 he filed an amended return for that piece of property, that piece of property up in Detroit and a number of lots, amounting to $46,000. I think that is in substance what he answered. He showed no piece of property sold in 1947 on his income tax return, he couldn't find it. * * *

"* * * But I asked him where the $40,000 came from and he said he didn't know. I submit to you that there is a circumstance which would indicate to you that money can be traced. $40,000 in cash is a considerable amount of money. I have never seen that kind of money. I don't know if I ever expect to. At least, if I do, it will never be in cash. That is quite a bundle—$40,000. * * *"

4. "Now in reference to the second or individual indictment, the defendant is there charged with willfully and knowingly attempting to defeat and evade income taxes due and owing by himself to the United States of America by filing a false and fraudulent income tax return. There are three counts in this individual indictment.

"The first count of the individual indictment alleges that the defendant failed to report his share of all of the income received from the sale of used cars by a partnership in which he was a partner. You cannot convict the accused on this count unless the government establishes beyond a reasonable doubt that the partnership had income from the sale of used cars during the taxable period from November 1, 1945, to May 31, 1946, and that the defendant knowingly, willfully and fraudulently failed to report his share of all such partnership income in his income tax return for 1946. In order for the government to establish that the partnership had income the government must establish beyond a reasonable doubt, not only that one of the partners received certain money, but also that the money was received for the benefit of the partnership and not for the sole benefit of the individual partner."

$30,000.00 in cash in a hand satchel and deposited part of it in a bank in New York and made a large loan to a named person. Here is a part of the language of that decision (at page 500):

> "Under the theory upon which the case was tried, that specifically accounted for income had not been reported, * * * no legitimate purpose could have been served by the proof that the defendant's wife took to New York in a hand satchel $30,000 in cash * * * and that they had a tremendous wedding in one of the big hotels in the town at the cost of many thousand dollars. With that evidence before the jury, and no corrective charge given in respect of it, there was no possibility of defendant's securing an unprejudiced consideration by the jury of his claim that the omissions were due to oversight rather than intention. In addition, with no instruction given them in the matter, the jury is bound to have thought that this money was additional income which had been concealed and not reported."

We think what was there said is quite persuasive here.[5] And cf. Spies v. United States, 1943, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418; Ford v. United States, 5 Cir., 1954, 210 F.2d 313; Jones v. United States, 5 Cir., 1947, 164 F.2d 398; and Hartman v. United States, 8 Cir., 1954, 215 F.2d 386

■ We skip, for the time being, appellant's argument under his question 3 and take up that presented under question No. 5 dealing with the alleged improper argument of Government counsel.

The appellant had taken the witness stand in his own behalf and had introduced four witnesses who had testified to his good character, and the Government had offered none contra. Near the end of his closing argument, the Government's attorney made this statement:

> "Now, with respect to the character witnesses. Mr. Fowler has stated that Mr. Worton [who was making the argument] didn't produce anybody who would say that he is a bad man. Now, I don't go for that. I could probably have fifty people in here who would show that he isn't a good character. I am not trying Mr. Ginsberg's character. I am not trying his character or his reputation. I am trying him for income tax evasion. * * *"

In condemning this argument, we could not do better than to quote what was said by this Court in the recent case of Handford v. United States, 1957, 249 F.2d 295, 296:

> "A United States district attorney carries a double burden. He owes an obligation to the government, just as any attorney owes an obligation to his client, to conduct his case zealously. But he must remember also that he is the representative of a government dedicated to fairness and equal justice to all and, in this respect, he owes a heavy obligation to the accused. Such representation imposes an overriding obligation of fairness so important that Anglo-American criminal law rests on the foundation: better the guilty escape than the innocent suffer. In this case zeal outran fairness. The

5. The Government contends in the case before us that this case is differentiated from the Blumberg case in that the evidence was there offered as a part of the Government's case, whereas here the questions were asked only on cross-examination of the appellant and with the view of showing his intent. The argument is not without some convincing force. But, in Blumberg, it was specifically stated in the record that the evidence was not offered to prove that the money possessed and spent by the wife represented the concealment or evasion of income tax, but that the evidence was admissible on the issue of willful intent. That is the same argument made here. We rejected it categorically in Blumberg, and we do not think it is sufficient to demonstrate that what happened here did not constitute harmful error.

argument of the United States attorney in the district court was improper, prejudicial, and constituted reversible error." [6]

We recently reversed the conviction of a defendant upon a narcotics charge for a much less offensive statement than the one involved here, Nalls v. United States, 5 Cir., 1957, 240 F.2d 707, and authority is not wanting for enforcement of the fundamental rules of fairness even where no exception is taken to the argument.[7]

We hold that this statement of the prosecuting attorney constituted "plain errors * * * affecting substantial rights" under Rule 52(b), 18 U.S.C.A., governing criminal procedure. It was such an error, also, as would have been magnified in its influence on the jury by an objection and motion for mistrial. It made it so unlikely that the appellant could be given a fair trial, as the term is understood in our jurisprudence, that we hold it to be reversible error. This makes it unnecessary to decide whether the other errors discussed would, standing alone, justify a reversal of the case.

█ Under his third question appellant argues that the court below committed error which, he showed on his motion for new trial, resulted in manifest prejudice, in failing to require full responses to his two motions for bills of particulars, his motions for discovery under Rule 16, and in quashing his motion for subpoena duces tecum. The indictments against appellant were in general terms charging that his reported net income was a certain amount when in fact it was a larger specified amount. Without the aid of bills of particulars appellant was completely in the dark as to the details of the charges against him. The court ordered a bill of particulars in each case and one was filed, and appellant sought, by a second motion, additional information, which was denied. He thereupon sought to obtain the desired information by the other means mentioned.

The Government knew all the time that it was going to prosecute appellant for understating his income from the sale of a certain number of used cars to certain purchasers for certain amounts. The information chiefly sought by appellant's efforts at discovery was the names of these purchasers, the number of cars involved, and the tax deficiency claimed on each transaction. To have furnished this information to appellant would not have weakened the Government's case to any extent.

The testimony introduced by the Government related to nine purchasers and three hundred ninety-two cars. In some instances, the books of the purchasers were introduced in evidence, but, by and large, the Government relied upon the testimony of its agents as to what these books showed as to these transactions in relationship to what appellant's books disclosed.

Appellant took the books which were introduced in evidence, after such introduction, and placed them in the hands of accountants for analysis. But this was not completed before the jury had

---

6. To that text was cited the case of Berger v. United States, 1935, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 314, and this language was quoted from it:
  "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or the innocent suffer.

He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

7. See, e. g., the criminal case of Read v. United States, 8 Cir., 1930, 42 F.2d 636, 645, and the civil case from the Supreme Court of the United States, New York Central Railroad Co. v. Johnson, 1929, 279 U.S. 310, 49 S.Ct. 300, 73 L.Ed. 706.

**956**

returned its verdicts. Thereupon appellant filed motions and amended motions for new trial, attaching the reports of the auditors containing information calculated to discount considerably the evidence which had been given by the employees of these purchasing concerns.

As heretofore stated, the case turned into a swearing match between these employees of the purchasers on one side—bolstered by the testimony of the Government agents—and appellant on the other. The testimony of the appellant's auditors, set out in the motions for new trial, would have been of great benefit to appellant if it had been available for introduction in evidence or for purposes of cross-examination during the trial.

■ Matters relating to discovery, to the details of proof and to rulings on motions for new trial are essentially committed to the sound discretion of the trial court, and its rulings ought to be disturbed only in rare cases. We would not predicate a reversal upon these rulings of the trial court here under discussion, if they stood alone.

As matters turned out, however, appellant was subjected to the series of procedures here discussed which were, without question, highly prejudicial. The weight of his testimony was greatly discounted, if not destroyed, by the effective use made by the prosecution of his inability to explain the source of the several large deposits in the joint bank account he had with his deceased brother. His legitimate effort to bolster his standing before the jury by character witnesses was largely nullified by the bald and completely unjustifiable statement of the prosecuting attorney that fifty witnesses were available to contradict the four who had testified for appellant. And, finally, appellant was cramped in defending against the large number of automobile sales disclosed by the Government's proof and in cross-examining the witnesses against him, by being denied some sort of advance showing on the part of the Government of the items which were to be used in the prosecution against him.

It is doubtful if exceptions to some of the rulings were properly taken, but a careful reading of this whole record leaves us in doubt whether the jurors were not so prejudiced by the unwarranted assault upon appellant by the Government and the rulings of the court which we have discussed, that they were not able to reach their verdicts based alone on the evidence properly before them.

We are constrained to hold, therefore, that under the circumstances herein discussed the judgments should not be permitted to stand; cf. Tomley v. United States, 5 Cir., 1957, 250 F.2d 549, 551; Dillingham v. United States, 5 Cir., 1935, 76 F.2d 36; Boyett v. United States, 5 Cir., 1931, 48 F.2d 482. They are therefore reversed and the cases are remanded for a new trial.

Reversed and remanded.

CAMERON, Circuit Judge (dissenting).

I agree with my brethren upon the factual premises upon which the majority decision rests, but not with the conclusions. The most damaging error upon which the reversal is predicated is that relating to the breadth of cross-examination to which the Government attorney was permitted to go in exploring appellant's knowledge of deposits in the joint bank account he had with his brother. I think the unexplained receipt of large sums of money, under the facts of this case, was probably a proper matter for cross-examination if held within reasonable bounds. Doubtless the judge below would have narrowed the scope of this examination if he had been given a chance. But the only objection made during the extended cross-examination is that set forth in Footnote 2 supra. That objection was addressed solely to the contention that it was immaterial whether or not the $40,000.00 deposit was made in cash. The argument of the Government's attorney set forth in Footnote 3 was not objected to at all, and the instruction copied in Footnote 4, even if it was calculated to benefit appellant in the manner claimed was not covered by a

sufficient objection under Rule 30[1] of the Rules of Criminal Procedure.

The very reprehensible argument made by the attorney for the Government concerning his ability to produce fifty character witnesses was not objected to at all.

The matter of discovery of bills of particulars and the like must be left to the discretion of the trial court. United States v. Socony Vacuum Oil Co., 1940, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; Goldman v. United States, 1942, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322; Indiviglio v. United States, 5 Cir., 1957, 249 F.2d 549, 554 et seq. Aside from this, the stenographic report of the pretrial conferences shows that the parties discussed the Evans books, which constituted the largest proportion of the items relied upon by the Government.

In my opinion, by far the most serious deviation from accepted procedure, committed by the Government in the trial of the case, had to do with the use made of the dozen or more charts introduced in connection with the testimony of the revenue agents. The "take-offs" made by these agents from the books of the nine concerns which had purchased cars from appellant constituted the only actual evidence of these transactions placed before the jury, although the books of four of the nine were offered in evidence *en masse*. Agent Weir, who had done the greater part of the work on the Evans books, died before the trial, and his work sheets and the summaries made therefrom were received in evidence as if the dead man had been there to prove their correctness.

More important the agents were permitted to use these take-off sheets and the work papers of the agents—secondary evidence at best—to construct charts made up of a composite of these work sheets covering the various purchases and contrasted with figures taken by the agents from the books of appellant, his partnership and the corporation of which he was an officer.

One or more agents, authors of the foregoing charts, were permitted to remain in the courtroom and, listening to the testimony of witnesses, to place upon those charts their concepts of what the witnesses had testified, and to add to the whole assembly their own opinions as to what conclusions ought to be reached from the various processes of comparison, addition, subtraction, and deduction.[2]

1. "No party may assign as error any portion of the charge *or omission therefrom unless he objects thereto before the jury* retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." [Emphasis added.]

2. Some of the answers of the agents would run into several pages. The following excerpt from one of them will show the method of proof resorted to by the Government:

"This is during the taxable year * * during which there was in existence the partnership and the corporation, and that is why we have three separate net worths. [As if net worth had any place in a prosecution based upon specific omissions.] You will see that there are two corporation figures which will be united into one, later. However, the total is all we are concerned with now. During the period * * * R. S. Evans, by the testimony, in the Nash records it shows that they sold Evans $64,765; that was testified to in Exhibit 43. The Evans records show that they paid $115,310.50, and the mathematical difference between the two is $40,545.50 in this particular instance, as testified to in Exhibit 8, by Mr. Zuckerman. Julius Stern, ten cars, for $4,890, was testified to in Exhibit 43 by Mr. Zuckerman, and the cost by Mr. Stern, as testified to in Exhibit 19 that he paid, is $7,465. He also testified that he paid in cash $2,575. Gem Motors, fourteen cars for $5,765, as testified to by Mr. Zuckerman in Exhibit No. 43, as appears in the testimony in Exhibit 21, Gem Motors paid $11,196 for these cars. And also in Exhibit 21 they paid in cash $5,431. There again, is a mathematical difference between the two (indicating). Regil Motors, the Nash records show, by the testimony of Mr. Zuckerman in Exhibit 43, as per the Nash records as testified to by Mr. Zuckerman on Exhibit 43, shows $875, and as per the *Regil Motors records* on Exhibit 15, it shows $1,475. And in the category, 'others,' according to the Nash records,

In my opinion, this damaging discussion, based essentially upon analysis and opinion, was not testimony at all, but summation, argument, pure and simple. It is doubtful if the agents testified to any fact which could be called testimony —if so, it was an infinitesimal part of the whole. If the Government is to be permitted to resort to such methods in developing its cases, the court should, in my opinion, tell the jury that the witness is not essaying to give any facts, testimony in its only true sense, but is summing up the case, is making an argument as essentially partisan as the closing argument of the United States attorney —with a corresponding reduction in the latter's time for argument.

The point is that the appellant did not object to this method of proof. Various objections were interposed as to the minutiae of the statements the agents were making, but appellant did not ask the court to take any action which would protect him from such prejudicial methods,[3] and no error is argued based upon them.

Every trial lawyer is faced, at every stage of a case, with the problem whether he should risk the ill will of the jurors by interposing frequent objections, or should cultivate their good will by seeming to cooperate in the fullest development of the truth. But this is an election which must be made. Appellant was represented by eminent and astute counsel and throughout the trial he elected to withhold the making of objections and take his chances with the jury. Concerning a situation resembling this one, we said recently, in De Fonce Construction Co., Inc., v. City of Miami, 5 Cir., 256 F.2d 425, 428:

"All that the record shows is that both parties, exercising a self-imposed restraint as remarkable as it is unusual in making objections and exceptions, each no doubt speculating on a jury verdict, have committed the trial of the case to the district judge without substantial objection or other form of interposition. Having thus chosen their course, it is too late for the losing parties, after the speculation has turned out badly for them, to depart from it by seeking

Nash received $6,097.62, and there is no testimony on that, and inasmuch as there is no difference there, there is no result in the difference here. There is a total of $82,392.62, as the total of the five above, indicating sales by Nash during this period. A total of $141,544.12 representing the total paid for these cars, as testified in four instances, and there is no change relating to the 'others.' That is during the time of the partnership. It was incorporated on February 1947, and so during that time the testimony is that Nash sold to R. S. Evans 120 cars, as testified to by Mr. Zuckerman in Exhibit No. 42, for $66,030. And the testimony in Exhibit 9, of the Evans records, shows that Evans paid $95,525 for these cars, against the testimony in Exhibit 9. And it also shows that $29,495 was paid in cash. However, that again also is a mathematical difference. Regil Motors, the Nash records testified to by Mr. Zuckerman, Exhibit No. 42, 27 cars for $10,272. Exhibit No. 15 shows that they paid $17,870 for these cars, and there is a $7,145 mathematical difference. The A. A. Auto Sales for the same period, according to the Nash records, as testified to by Mr. Zuckerman in Exhibit No. 42, was for 20 cars at $16,900; and as testified to in Exhibit 29, the cost to A. A. Motor Sales, according to Muir's testimony, was $22,275, and also as testified, $5,375 in cash. This again is the mathematical difference (indicating)."

3. The court finally intervened with this statement relating to one small segment of the case: "I do not think that there ought to be any charts exhibited to the jury, in view of the feeling that I have about the case, which purports to split fifty-fifty the diverted income. You can argue it to the jury, but they have got to make a finding on that themselves. They have got to infer that from the evidence of the case, and I do not think any expert can infer it for them."

This, in my opinion, was a correct and clear statement of the law, but it came after many charts had been presented before the jury in bold letters and after the damage to the appellant had been done. Doubtless the court would have ruled earlier on the question if it had been called upon to do so.

for the first time here to put the court in error and invalidate the results of this long trial by making large and unsupported claims of injury sustained by them, claims which were not made and preserved below."

In my opinion, "Sitting as we do as an appellate court, we are justified in finding error in the actions of the trial court only with respect to matters presented to that court, and limited to the contentions made to it as the basis for the requested action." [4]

Where, as here,—and it must be recalled that appellant does not contend that the evidence was insufficient to convict him—the "record fairly shrieks the guilt of the" appellant, Lutwak v. United States, 344 U.S. 604, 619–620, 73 S.Ct. 481, 490, 97 L.Ed. 593, I do not think we should apply Rule 52(b) and notice the errors mentioned.[5] Therefore, I respectfully dissent.

4. Indiviglio v. United States, supra, 249 F.2d at page 553. In that case, we discussed the whole question fully and cited and considered the authorities at pages 560–563.

5. Cf. the cases listed in Footnote 2 of De Fonce v. Miami, supra.