UNITED STATES of America, Plaintiff-Appellee,

v.

Pete ARENDALE, Defendant-Appellant.

No. 29963.

United States Court of Appeals, Fifth Circuit.

June 23, 1971.

Pete Arendale, pro se.

Leon Farmer, Jr., Athens, Ga., Court appointed, Robert B. Thompson, Gainesville, Ga., for defendant-appellant.

William J. Schloth, U. S. Atty., D. L. Rampey, Jr., Charles T. Erion, Asst. U. S. Attys., Macon, Ga., for plaintiff-appellee.

Before RIVES, GOLDBERG and MORGAN, Circuit Judges.

RIVES, Circuit Judge:

Arendale appeals from his conviction for possessing an unregistered still and carrying on the business of a distiller in violation of 26 U.S.C. §§ 5179(a), 5601 (a), and 5173. He was charged in a five-count indictment along with three others, Donald Richard Smith, Rayford Carroll Childers, and Isaac (Ike) Robert Childers.[1]

The case against Arendale is based entirely on the testimony of a named co-conspirator, Robert Clayton Ginn. Ginn and Donald Smith were arrested at the still site on Ginn's farm. Ginn had pleaded guilty to "illegal manufacturing at a liquor still," but had not been sentenced at the time of his testimony. We set out the Government's case as related by Ginn.

Ginn, in need of money, was amenable to the suggestion of Isaac Childers that the two men enter the bootlegging business as partners. Childers had the necessary apparatus but needed a location for the still. They reached an agreement in December 1968, and the still was set up in stages between mid-February and the first part of March 1969. It was run eleven times, between March 11 and March 28, 1969, and the arrest of Ginn and Smith at the still site was made on March 31, 1969.

Ginn further testified that Smith and Rayford Childers, a brother of Issac, were hired to run the still. Ginn and the four named defendants set up the still (T. 30), but the record reveals that the only act attributed to Arendale in "setting up" the still was to crawl inside the still pot and weld some cracks. At the time Arendale did this work, there were on the site two plywood mash boxes, one or both containing mash, and a copper radiator (used to condense the distilled spirits). Ginn, Smith and Rayford Childers were present at the time.

The stage of readiness of the still is important in determining Arendale's guilty knowledge. The Government contends that, when the welding was done, "all of the essential parts of the still, as well as mash, were present at the site; [and] the still apparently started operating immediately thereafter * * *." But the Government's proof belies its conclusion.

Special Investigator David A. Barrineau, Alcohol, Tobacco and Firearms Di-

---

[1]. This appeal concerns Arendale alone. He was acquitted on the counts charging conspiracy to violate the liquor laws, 18 U.S.C. § 371, carrying on the business of a distiller with the intent to defraud the United States of the tax imposed on distillers, 26 U.S.C. § 5602, and possession of untaxed liquor, 26 U.S.C. §§ 5205(a)

(2) and 5604(a). Rayford Childers and Donald Smith were tried jointly with Arendale. Both were convicted on the same counts as Arendale and on the conspiracy count. Smith alone was convicted of possessing untaxed liquor. Isaac Childers pleaded guilty.

vision of the United States Treasury Department, one of the arresting officers, testified that the still operation utilized a fuel oil blower—a furnace that produces a high rate of heat, an electric pump with electric wire and plastic tubing running from a creek over 100 yards away,[2] and that he saw a 480 gallon whiskey box used to catch the distilled liquor, three 55 gallon fuel oil barrels, and three 960 gallon plywood fermenter boxes. Though on a verdict of guilty we must consider the evidence in the light most favorable to the Government, Glasser v. United States, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680, we are not bound to assume things which are not in evidence. The Government has failed to show that two essential elements for the operation of a still—a water and heat supply—were available when Arendale was present at the still site. Furthermore, the Government's conclusion that the still was operated immediately after Arendale's work is not supported by Ginn's testimony. Arendale did his work "about the first of March," but the still was first run on March 11.

The only other relevant acts attributed to Arendale were that on two occasions, on unknown dates, plastic jugs were picked up from his home. On one occasion Ginn saw Arendale and obtained four cases containing 64 jugs each.

We first discuss the sufficiency of the evidence to sustain each count. On the charge of possession of an unregistered still, we find the evidence so lacking as to require reversal. On the charge of carrying on the business of a distiller, we discuss the evidence to illustrate the closeness of the case, a necessary background to the determination of whether closing arguments by the prosecuting attorney constitute reversible error.

## I.

■ Since Ginn, Donald Smith and Rayford Childers were present when Arendale did the welding, it can hardly

be said that the Government has shown anything which would indicate that his work evidenced custody, possession or control of the still, which is necessary to convict under 26 U.S.C. § 5601(a)(1).

"In Bozza v. United States, 330 U.S. 160, [67 S.Ct. 645, 91 L.Ed. 818], the Court squarely held, and the United States conceded, that presence alone was insufficient evidence to convict of the specific offense proscribed by § 5601(a)(1), absent some evidence that the defendant engaged in conduct directly related to the crime of possession, custody or control. That offense was confined to those who had 'custody or possession' of the still or acted in some 'other capacity calculated to facilitate the custody or possession, such as, for illustration, service as a caretaker, watchman, lookout, or in some other capacity.' Id., at 164, [67 S.Ct. at 648]. This requirement was not satisfied in the Bozza case either by the evidence showing participation in the distilling operations or by the fact that the defendant helped to carry the finished product to delivery vehicles. These facts, and certainly mere presence at the still, were insufficient proof that 'petitioner ever exercised, or aided the exercise of, any control over the distillery.' Ibid."

United States v. Romano, 1965, 382 U.S. 136, 140, 86 S.Ct. 279, 15 L.Ed.2d 210. The evidence on this count of the indictment is insufficient and it is reversed.

## II.

The sufficiency of the evidence for carrying on the business of a distiller presents a closer question. This is "an offense which is one of the most comprehensive of the criminal statutes designed to stop the production and sale of untaxed liquor." United States v. Gainey, 1965, 380 U.S. 63, 67, 85 S.Ct. 754, 757, 13 L.Ed.2d 658, and one who aids and abets can be convicted as a principal. 18 U.S.C. § 2.

---

2. Ginn testified that Isaac Childers replaced a gasoline pump with the electric pump on March 19, 1969.

There are two activities attributed to Arendale which connect him with the illegal operation—the welding of the still pot and the supplying of jugs.

United States v. Falcone, 1940, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128, held that conviction on conspiracy charges could not be sustained against persons who sold a large volume of sugar, yeast and cans to others for use in illegal distillation, even assuming that the sellers knew of the illegal intentions. "The evidence respecting the volume of sales to any known to be distillers is too vague and inconclusive to support a jury finding that respondents knew of a conspiracy from the size of the purchases even though we are to assume what we do not decide that the knowledge would make them conspirators or aiders or abettors of the conspiracy." 311 U.S. at 210, 61 S. Ct. at 206.

If Arendale had been arrested at the time he did the welding, it is not a foregone conclusion that he could have been convicted of carrying on the business of a distiller.[3] Liverman v. United States, 4 Cir. 1958, 260 F.2d 284, held that the absence of a boiler and condenser or coils indicated that the still in question was not readily capable of being set up in an operating state, notwithstanding that the house heater and rubber hose present could have been pressed into service. We have found no decision indicating that a still is readily capable of being set up when it has no water or heat supply. Rewis v. United States, 5 Cir. 1957, 242 F.2d 508, stands only

for the rule that conviction for carrying on the business of a distiller may be sustained even though actual distillation had not yet commenced. Nothing is said in that opinion about the stage of readiness. In Burke v. United States, 5 Cir. 1968, 387 F.2d 905, apparently all necessary equipment was found at the site.[4]

Whether Arendale's actions—the welding coupled with supplying of plastic jugs to persons later operating the still—are sufficient to convict him as an aider or abettor in carrying on the business of a distiller is a question we do not decide, for the conviction must be reversed on another ground and the evidence may be strengthened on a retrial.

### III.

This appeal presents a serious question as to the propriety of certain closing arguments made to the jury. The challenged arguments must be viewed in context, which necessitates a detailed examination of the development of the case.

The defense called two witnesses. One was the defendant Smith who had been arrested with Ginn. Smith testified that his role was minor—that of a hired hand. He implicated Ginn and Isaac Childers, but sought to exculpate Rayford Childers and Arendale.

Smith testified that he first met Arendale only five or six weeks prior to trial. According to Smith, Arendale sought him out in an effort to locate Ginn. Smith said he accompanied Arendale to

---

3. This is not a case where the still had been operable previously. Burke v. United States, 5 Cir. 1968, 387 F.2d 905; United States v. Williamson, E.D.Tenn. 1953, 111 F.Supp. 411.

4. The stage of readiness is a critical factor. Illegally carrying on the business of a distiller is proscribed by 26 U.S.C. § 5601 (a) (4). A "distiller" is defined in 26 U.S.C. § 5002(a) (5) as follows:
"The term 'distiller' shall include every person—
"(A) who produces distilled spirits from any source or substance; or
"(B) who brews or makes mash, wort,

or wash, fit for distillation or for the production of distilled spirits * * *; or
· "(C) who by any process separates alcoholic spirits from any fermented substance; or
"(D) who, making or keeping mash, wort, or wash, has also in his possession or use a still."
The statutes do not define the term "still." If Arendale is to be penalized for his work on a still, the apparatus must have been in such condition that he would recognize it as a still or his knowledge that illegal activity was to be carried on must be shown by other evidence.

Ginn's home to introduce the two. Smith denied having any conversation with Ginn, and testified as follows:

"Well, Mr. Arendale asked him how he got his name involved with this. And I think Mr. Ginn mentioned something about losing his place, or something, and he was led into it, or something. Some name was mentioned that he signed the statement against Mr. Arendale. I don't know what kind of statement that was or nothing about that." (T. 115)

The other defense witness was William Howard Dean, who sought to provide an alibi for Arendale and to discredit Ginn. Dean testified that he had not known Arendale before working on a construction project with him from the first week in October 1968 to mid-January 1969. The job was a great distance from the county in which the still was located, and involved working ten to twelve hours per day, seven days a week. Dean said the indictment raised questions in his mind, because the conspiracy count alleged activities dating back to mid-November 1968, when he and Arendale were supposedly working on the construction job.[5] Because of this, Dean said, he went to talk to Ginn, whom he had known previously, to ask him why Arendale was named in the indictment. On direct examination, he testified that Ginn told him that he and Isaac Childers were involved, that he told the Government others whose names he did not know had been at the still, that Arendale's name was mentioned and he, Ginn, had to involve somebody, and that he was afraid of losing his home because the Government was going to charge him with $18,000 in taxes. (T. 84)

The Government was thus confronted with a man who appeared to be a dis-

interested witness who had done severe damage to its key witness. Ginn, a family man, who was employed as a postal clerk, had gone into the bootlegging business because his farming operation left him in debt,[6] who had pleaded guilty and was awaiting sentence, was in need of bolstering. The Government did its best.

On cross-examination, the Government brought out that Dean was currently unable to work because of a heart condition and had no present income from any source. Two other men who had known Dean and Arendale on the construction job were not present to testify, and both, to Dean's knowledge, were currently employed. By this the Government sought to instill in the jurors' minds the possibility that Dean was being paid to perjure himself because he needed money. The Government also sought to bring out any criminal record Dean might have had, but dropped this line of questioning after Dean, on voir dire, testified that he had none.

The Government then brought out that Dean had been present in the courthouse the entire week prior to the trial, and that he had spoken to one juror of the previous week. Dean admitted speaking to the one juror, a lady whom he knew, but denied speaking to her or anyone else about this case. The defense sought to counter the Government's efforts to attribute improper conduct to Dean.

On re-direct, Dean testified that he was in the courthouse for the entire week because he had been asked to be a witness in this case. He testified that he saw Arendale's lawyer, Mr. Farmer, and the Assistant United States Attorney, Mr. Erion, each day, as well as other persons involved in this trial. Dean also

---

5. There is actually no inconsistency between the allegations in the indictment and Dean's testimony. Dean testified that after mid-January 1969 he no longer worked with Arendale and could not account for his whereabouts. No overt act is attributed to Arendale until March 1 of that year.

6. Dean presented testimony that the Government was pressing Ginn for taxes. The jury might have inferred, though there was no evidence to this effect, that the taxes were for the liquor and then concluded that this was another reason for Ginn to provide testimony favorable to the Government.

testified that he saw federal revenue agents speak with jurors.

When the defense rested, the Government called Ginn as a rebuttal witness. Dean's testimony needed answering.

Ginn testified that Arendale, Smith and Dean had all been to see him concerning his testimony. Arendale came to see him three times, the last time with Smith. (This contradicted Smith, who testified he introduced Arendale to Ginn.) Arendale allegedly asked Ginn why his name had been mentioned since he had not been caught at the still site. According to Ginn, Arendale asked Ginn to misidentify him in court, and said he would sue the Government and split the recovery with Ginn.[7]

The questioning then turned to Dean. Ginn stated that Dean visited him in April (of what year is not revealed). Ginn's account of this meeting is as follows:

"He stated that he had been by my house several times previously to see me and had been unable to catch me at home, and he said, 'I guess you know why I'm here? I'm here on behalf of one of the defendants named in the indictment, Pete Arendale.' I asked him what relation was he to Pete and he said, 'Just a good friend. I worked with Pete and I want to try to keep him out of trouble.' He said, 'I don't want to do anything to hurt you unless I have to.' He said, 'I worked with Pete and I'll have to change my time records in order to prove that he was not there at the date you said he was.' And he also said, 'If you will do this, we are prepared to help you financially and otherwise.'" (T. 120)

The defense tried to discredit Ginn, taking the position that since this testimony was not brought out in the Government's case in chief, there was a fair inference that Ginn invented this version of the meetings with Arendale and Dean to rebut Dean.

On cross-examination after Ginn's original testimony, Ginn was questioned vigorously about with whom he had discussed the case. But the questions were directed to whether Ginn had talked to federal law enforcement and prosecution personnel, apparently to bring out any deals Ginn might have made for his testimony. Ginn was not asked specifically if he had talked to Dean and Arendale.

But the Government still had no explanation of why it had not used such damaging evidence in its case in chief. The Government felt that it needed to do so, and to demonstrate to the jury that it knew of the conversations prior to the time Dean took the stand (thus refuting the argument that Ginn invented his version after hearing Dean). The Government sought to do so in closing argument. This will be discussed in detail below, but first we set out other relevant testimony which also gave rise to an insistence on error regarding closing arguments.

When Ginn was being cross-examined on rebuttal, the defense brought out that Ginn's wife had knowledge of the still but had remained silent. Ginn testified that she had been at the still several times. Mr. Scott, attorney for Smith and Rayford Childers, then asked, "What did she do when she walked up there?" Ginn answered, "She saw Pete Arendale at the still one time." Mr. Farmer, attorney for Arendale, objected on hearsay grounds, and the Court instructed the jury to disregard the answer. No motion for mistrial was made, and there is no contention that this alone constitutes reversible error.

A question also arose with regard to whether or not Mrs. Ginn could testify as to the conversation between Dean and Ginn. Dean had evidently been to see Ginn several times before finding Ginn at home. Dean spoke to Mrs. Ginn, but never told her expressly why he wished to see her husband. On the day he found

7. There was no testimony as to what might be the basis of such a suit—the Government suggests that it would be for false arrest.

Ginn, Dean testified that he had seen Mrs. Ginn for about thirty minutes, and that "she came out and joined the conversation." The testimony does not show that she was present during relevant parts of the conversation between the two men. Ginn's testimony corroborated Dean's in this regard. He testified that his wife was present only "for a few minutes" when he talked to Dean. Also, he said that she did not hear anything said during Arendale's visits.

Mr. Farmer, representing Arendale, opened the closing arguments for the defense. He vigorously attacked Ginn's credibility and questioned why, in his original testimony, Ginn had not mentioned talking to the defendants and Dean, as well as the accompanying threats and offered bribes.

Mr. Scott, representing Smith and Rayford Childers, noted that Mrs. Ginn was originally sworn in as a Government witness. He questioned why the Government had not called her. She had been at the still; why wasn't she used to identify the persons she had seen there? She might have heard her husband talking to Dean; why wasn't she called to verify her husband's story? Mr. Scott suggested that the Government failed to call her because it had something to hide.

It is to be noted that these defense arguments made no reference to any hearsay testimony or evidence not in the record.

McClanahan v. United States, 5 Cir. 1956, 230 F.2d 919, clearly shows that if Mrs. Ginn was to be called as a witness. the burden to do so was on the Government.

"The failure of a party to produce as a witness one peculiarly within the power of such party creates an inference that such testimony would be unfavorable, and may be the subject of comment to the jury by the other party. Ford v. United States, 5 Cir. 1954, 210 F.2d 313. It is said that no inference arises, and hence no comment is permissible, 'where the person in question is equally available to both parties; particularly where he is actually in court; though there seems to be no disposition to accept such a limitation absolutely or to enforce it strictly.' Wigmore, Evidence, Vol. II, pp. 169–171, § 288. Here the person not called was or had been the appellant's attorney and it might be expected that his testimony, if given, would corroborate that of the appellant as to the legal advice given. In such situation it cannot be said that the attorney was as available to the prosecution as to the defense. The rule is thus stated:

" ' * * * the question of equal availability of a witness not called is largely a question of fact, and various courts have regarded all manner of circumstances as bearing upon the matter.' Jones, Commentaries on Evidence, Vol. I, pp. 169–170, § 98.

It has been well said that 'the availability of a witness is not to be determined from his mere physical presence at the trial or his accessibility for the service of a subpoena upon him. On the contrary, his availability may well depend, among other things, upon his relationship to one or the other of the parties, and the nature of the testimony that he might be expected to give in the light of his previous statements or declarations about the facts of the case.' Deaver v. St. Louis Public Service Co., Mo.App., 199 S.W.2d 83, 85."

McClanahan v. United States, *supra,* 230 F.2d at 925, 926.

The Government cannot seriously contend that Mrs. Ginn—the wife of the man who provided the only testimony against two of the accused and who had pleaded guilty and was hoping for leniency in his sentence, a woman who knew of the still but informed no law enforcement agency—should be called as a witness by the men her husband accused. But the Government chose to do so in closing argument.

The Assistant United States Attorney told the jury that he had not called Mrs. Ginn because her testimoy would have been cumulative. Then, in two separate instances, he said that if the defense disbelieved Mr. Ginn, it could have called his wife. There were no objections and the record does not disclose any instructions requested by either side regarding the failure to call Mrs. Ginn.

But the scope of the argument did not stop there. The prosecutor also said, "The plain fact of the matter is that if you will remember what Mr. Ginn testified to this morning, he said that she [Mrs. Ginn] knew the still was there. He said—started to say something about what she had seen and he got cut off by Mr. Farmer." Mr. Farmer promptly objected to this reference to the excluded testimony, and the Court instructed the jury to disregard the statement by the prosecutor. No motion for mistrial was made.

When the Court sustained the objection, the prosecutor stated, "Yes, sir, I was not going to refer to anything he said, Mr. Farmer, but we'll go ahead." This indicates that the prosecutor was under the impression that it was permissible to call the jury's attention to the hearsay and its being excluded, provided he did not repeat the substance of the hearsay. Instead of being circumspect with regard to excluded testimony, the prosecutor's argument was just the opposite.

The Government seeks to rely on the cases which hold that certain arguments made by the prosecutor in response to defense arguments are proper, whereas if the line of argument had been initiated by the prosecutor it would be improper. *See* Montford v. United States, 5 Cir. 1959, 272 F.2d 395; Ochoa v. United States, 9 Cir. 1948, 167 F.2d 341. But while it is clear that the Government was entitled to explain why it had not called Mrs. Ginn and that it was allowed—for want of objection—to argue that the defense should have called her, no one led the prosecuting attorney into referring to the excluded hearsay. This was an area which defense counsel had avoided.

The prosecutor then turned to the argument that Ginn's rebuttal testimony had been manufactured to refute Dean's allegations. It was first suggested that the Government knew Ginn's account of the meeting with Dean, and suspected that if Dean testified he would give an inconsistent account—a false account in the eyes of the Government. Since the Government did not wish to force anyone to "create any more stories," it chose not to bring the matter up.

But the prosecuting attorney, still felt it necessary to convince the jury that he knew of the meeting between Ginn and Dean prior to Dean's taking the stand, and thought he had a conclusive argument to show this. We quote at length from the record to show how the argument was made and the form of the accompanying objections.

"MR. ERION: * * * As to Mr. Dean, you know, as well as I do, that there would be nothing wrong with my talking to any one of these people before you get on this case out there and say, 'Hi, how are you,' if I know you. There is nothing wrong with that, and there's nothing wrong with Mr. Dean doing that. And normally nobody would have paid any attention to anyone doing this. But if you want to know whether or not we knew yesterday about all these things, ask yourself why anyone had to call to keep an eye out for Mr. Dean when he's out in the hall and know that he talked to some jurors. I wouldn't have paid any attention to most anybody else— * * * [Mr. Farmer's objection to the reference to talking to more than one juror sustained.]

"MR. ERION: * * * I may be wrong [as to the number of jurors], but if you will remember, why do you think anyone had any cause to notice that he talked to anybody unless we knew already that he had told, 'Yes, he was going to try to help Mr. Arendale out.' We don't

—

      *      *      *      *      *      *

"MR. FARMER: * * * I'm object-ing to the statement * * * that they would not have been watching him unless they knew something. In other words, Mr. Erion is trying to convey the idea that he or his office knew something concerning Mr. Dean and they have had every opportunity to—

"THE COURT: Well, I think the evi-dence was brought by you that the Dis-trict Attorney had conferred with Mr. Ginn and Mr. Ginn had conferred with the District Attorney. And I take it that the District Attorney is simply drawing inferences from the actual evidence in this case. He's authorized to do that. So let him proceed.

"MR. ERION: Thank you, Your Hon-or.

"Ladies and gentlemen, as I said be-fore I made that statement, I haven't testified—I can't tell you what I know. It's not in evidence, I'm just asking you what sort of conclusion you make of it. I'm not telling you what I know because I wasn't on the witness stand. I'm not a witness. But you know what happened.

"THE COURT: Now, I didn't mean to let you go any further to suggest that you know anything except what has come out in the trial of this case from Mr. Dean's testimony and any other testi-mony that has come out in this case.

"MR. ERION: Yes sir. Your Hon-or—

"MR. SCOTT: Your Honor please, on behalf of my clients, on the basis of the statement just made to the jury, I move for a mistrial.

"THE COURT: I overrule the motion, but I have already ruled on the argu-ment." (T. 132–135)

The inference that Dean was trying to influence jurors may have been a prop-er response to defense arguments. But there was no justification to add the ele-ment that the Government considered Dean such a scoundrel that he had to be watched. The testimony in evidence permitted only the inference that Dean had been noticed by someone talking to one juror. Dean had testified that he

had seen the prosecuting attorney and federal revenue agents in the courthouse during the previous week. Any one of these persons could have noticed the con-versation between Dean and the one jur-or. In the minds of the jurors, there could have been a marked difference be-tween attempting to influence a wit-ness and attempting to influence a juror. It should be noted that if there was anything illicit about Dean's talking to the juror, that juror could have been called by the Government. But this al-ternative was foregone, and the prosecu-tion sought to rely on innuendo and ref-erence to matters not in the record.

After Mr. Farmer's second objection, the Court expressly limited the prosecut-ing attorney to "drawing inferences from the actual evidence in this case." The final statement by the prosecuting attor-ney immediately following this warning was unjustified.

Ochoa v. United States, 167 F.2d 341, on which the Government relies, does not go so far as to sanction reference to material facts not in evidence in re-sponse to defense arguments. Ochoa held that the prosecution may refer to sub-jects such as capital punishment and life imprisonment if the subjects are broached by the defense. But when touching upon the facts of the case, "the argument is to be based upon the evi-dence or reasonable inference therefrom." Ochoa, supra, 167 F.2d 341, 344.

The case against Arendale depended solely on the credibility accorded Ginn's testimony by the jury. "[E]rror, which under some circumstances would not be ground for reversal, cannot be brushed aside as immaterial [where] there is a real chance that it might have provided the slight impetus which swung the scales toward guilt." Glasser v. United States, 1942, 315 U.S. 60, 67, 62 S.Ct. 457, 463, 86 L.Ed. 680.

The record reveals the jury's con-scientious effort to reach a correct ver-dict. It returned several times to re-quest additional instructions. It re-quested a copy of the testimony in the

case if available, and the testimony of Donald Smith and the rebuttal testimony of Ginn if that alone could be presented. It settled for the court reporter reading the rebuttal testimony of Ginn.

Where the evidence against the accused is based solely on the testimony of a coconspirator, errors connected with his credibility and that of those whose testimony contradicts him take on added importance. See Nalls v. United States, 5 Cir. 1957, 240 F.2d 707; Handford v. United States, 5 Cir. 1958, 249 F.2d 295. We quote from Berger v. United States, 1935, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314:

> "It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations [to see that justice is done, that guilt shall not escape nor innocence suffer], which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none."

The conviction in *Berger* was overturned. The Court characterized the case against him as "weak." It depended upon the testimony of an accomplice, a man with a long criminal record. "In these circumstances," the Court said, "prejudice to the cause of the accused is so highly probable that we are not justified in assuming its non-existence." 295 U.S. at 89, 55 S.Ct. at 633.

While the Government's key witness in the instant case had no criminal record, his possible motives for giving false testimony make his claim to credibility vulnerable. Although it was for the jury, as the trier of fact, to determine credibility, it is the closeness of the evidence against Arendale which makes the errors committed by the prosecuting attorney prejudicial.

A single error might have been cured by the Court's sustaining the objection, but there was persistence in error.

"Where [the] possibility of prejudice existed, the government should have been particularly circumspect, instead of the opposite. We cannot sanction such improprieties." Kitchell v. United States, 1 Cir. 1966, 354 F.2d 715, 719.

### IV.

█ The Government points out that Arendale's counsel, though he made the objections to the improper argument concerning Dean being watched, did not move for a mistrial. Counsel for the other defendants made such a motion, with the Court overruling it and indicating that the Court had already ruled for the defendants on the objection.

In United States v. O'Brien, 7 Cir. 1963, 319 F.2d 437, the Government attorney improperly commented on the failure of one of three defendants to testify. Counsel for that defendant objected and moved unsuccessfully for a mistrial. Appellant O'Brien, one of the codefendants, had not testified but his counsel failed to object. The Seventh Circuit held that O'Brien had failed to preserve error since the improper remark had been limited to a codefendant, O'Brien had not been named, and the Government attorney did not refer to "the defendants."

But here the basis of the objections concerned the witness who had attempted to exculpate Arendale. Arendale's counsel initiated the objections to the Government's remarks. If no objection had been made, the remarks complained of might not be subject to review. Allen v. United States, 5 Cir. 1951, 192 F.2d 570; Clark v. United States, 5 Cir. 1954, 213 F.2d 63. But here the error was brought to the attention of the Court by objection, and, as to the last improper statement quoted above, the Court on its own initiative quickly rebuked the Government. A motion for a mistrial by Arendale's counsel would have been a hollow gesture, serving at most to preserve error for appeal rather than to call the Court's attention to the objectionable argument. If a motion for a mistrial

**1270**

were a necessity for reversal in every case, there would be little need for the plain error rule, Fed.R.Crim.P. 52(b).

The Government argues that, since counsel for Arendale made his objections in open court before the jury, he chose to emphasize to the jury what the Government was trying to do, *i. e.*, to impute improper conduct to Dean. It is argued that Arendale's defense strategy was to create the impression that the Government was playing unfairly, and that he wanted a jury verdict on this basis and clearly did not want a mistrial. Such a strategy might not allow the accused in some circumstances to urge plain error after an unfavorable verdict. Maryland Casualty Co. v. Reid, 5 Cir. 1935, 76 F.2d 30; United States v. Antonelli Fireworks Co., 2 Cir. 1946, 155 F.2d 631.

Admittedly, this was not the type of situation where an attorney might be said to have foregone the option to move for mistrial because he feared focusing the jury's attention on a matter he sought to avoid. Ginsberg v. United States, 5 Cir. 1938, 257 F.2d 950; Garris v. United States, 1968, 129 U.S.App.D.C. 96, 390 F.2d 862. But we do not so readily impute to the accused such risk-taking as does the Government. The Court was aware of the objectionable remarks and took measures to correct the harm done. It promptly rebuked the Government, and just as quickly overruled the motion for mistrial made on behalf of the other defendants. We cannot but assume that a similar motion by Arendale's counsel would have been dealt with similarly. Moreover, we cannot condone the reference by the Government to matters outside the record, in the form of the statement, "but you know what happened," coming directly after a warning by the Court.

Accordingly, the conviction of Arendale on both counts is reversed. Our decision obviates the need to decide his other contentions made on this appeal. Arendale should not be tried again for having possession, custody or control of the still, in violation of 26 U.S.C. §§ 5179

(a) and 5601(a), unless there is presented evidence of such possession, custody or control additional to that produced at the trial below. United States v. Bean, 5 Cir. 1971, 443 F.2d 17; Riggs v. United States, 5 Cir. 1960, 280 F.2d 949.

Reversed and remanded for proceedings not inconsistent with this opinion.