Nash Miami Motors, Inc. v. Commissioner. Sydney Ginsberg v. Commissioner.
Nash Miami Motors, Inc. v. Commissioner
Docket Nos. 68315, 68316.
United States Tax Court
T.C. Memo 1964-230; 1964 Tax Ct. Memo LEXIS 108; 23 T.C.M. (CCH) 1388; T.C.M. (RIA) 64230; August 31, 1964
*108 Nash Miami Motors, Inc., and its predecessor partnership, Nash Miami Motors, were engaged in the business of selling new and used automobiles. Sydney Ginsberg and his brother, Charles, were the principal officers and stockholders of the corporation and equal partners in the partnership. In selling used cars, Sydney and Charles at times invoiced the purchaser for an amount less than the negotiated sales prices of the cars sold and required the purchasers to pay the balance of the negotiated sales prices in cash, which was not reported in the income of the corporation or the partnership. Held: 1. That Sydney's distributive share of the income from the partnership was understated by reason of the failure of the partnership to report all income from the sale of used cars. 2. That the unreported proceeds from the sale of used cars on behalf of the corporation constituted additional income to the corporation. 3. That one-half of the unreported proceeds from the sale of used cars by the corporation constituted dividend income to Sydney. 4. That part of deficiencies in income tax of Sydney for 1946 and 1947 and of Nash Miami Motors, Inc., for its fiscal years ended November 30, 1947 and *109 1948, were due to fraud with intent to evade tax. 5. That assessment and collection of the deficiencies against both petitioners are not barred by the statute of limitations. 6. That a purported loss on the transfer of realty from the partnership to the corporation was not deductible in determining Sydney's distributive share of the partnership income for its fiscal year 1947. 7. That Sydney's distributive share of partnership income for 1947 was understated due to an unwarranted writedown of partnership inventories, but that respondent's determination should be adjusted for breakages and shortages in inventories. 8. That petitioners, having invoked the jurisdiction of this Court by filing a petition for redetermination herein, may not challenge the qualifications of judges of this Court to determine the issues raised in this proceeding on the ground that they are not appointed for a term of their good behavior as provided in Article III, Section 1, of the Constitution of the United States.
Daniel L. Ginsberg, [1] for the petitioner in Docket No. 68315. Forney B. Stafford and Richard C. Carter, Jr., for the petitioner in Docket No. 68316. Kenneth G. Anderson, for the respondent. *111 DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: In these consolidated proceedings respondent determined deficiencies in income tax of petitioners and additions to tax under section 293(b), I.R.C. 1939, [2] as follows: Deficiency
Year
Addition to
Docket
Income
tax.
No.
Petitioner
FYE -
tax
sec. 293(b)
68315
Nash Miami Motors, Inc.
Nov. 30, 1947
$17,906.07
$ 8,953.04
Nov. 30, 1948
8,222.19
4,411.10
Calendar
68316
Sydney Ginsberg
1946
2,655.79
1,327.90
1947
64,598.81
32,299.41
The issues for decision are: (1) Whether Sydney Ginsberg understated his distributive share of partnership net income of Nash Miami Motors, a partnership, for the years 1946 and 1947 by failing to include in his share a part of the proceeds from the sales of used automobiles sold by the partnership which the partnership failed to report in its partnership returns of income for its fiscal years ended May 31, 1946 and 1947; (2) Whether Nash Miami Motors, Inc., a corporation, understated its income *112 from the sales of used automobiles on its tax returns for its fiscal years ended November 30, 1947 and 1948; (3) Whether Sydney Ginsberg received from Nash Miami Motors, Inc., during the calendar year 1947 income taxable as dividends which he failed to report as income in his tax return for 1947; (4) Whether Sydney Ginsberg's distributable share of net income from Nash Miami Motors, a partnership, for 1947 was understated because it reflected deductions taken by the partnership on its partnership return of income for its fiscal year ended May 31, 1947, for: (a) A loss on the sale of partnership real estate; (b) An adjustment made to its inventory of parts and supplies; (5) Whether any part of the deficiencies in income tax of petitioners for the years involved was due to fraud with intent to evade tax; (6) Whether the applicable statute of limitations bars assessment and collection of the deficiencies; and (7) Whether a judge of this Court is qualified to hear and determine the issues raised in the pleadings in light of the fact that he is appointed for a term of years rather than during good behavior as required by Article III, Section 1, of the Constitution of the United *113 States.
Petitioners introduced no evidence and made no arguments on brief with respect to other issues raised by the pleadings, which will therefore be considered abandoned. General Findings of Fact The stipulated facts are incorporated herein by reference. Sydney Ginsberg, hereinafter referred to as Sydney, resided in Miami Beach, Fla., during the years 1946 and 1947 and filed individual income tax returns for those years with the collector of internal revenue at Jacksonville, Fla. Nash Miami Motors, Inc., a Florida corporation with its principal place of business in Miami, Fla., hereinafter referred to as the Nash corporation, filed corporation income tax returns for its fiscal years ended November 30, 1947 and 1948, with the collector of internal revenue at Jacksonville, Fla. Nash Miami Motors, a partnership hereinafter referred to as the Nash partnership, filed partnership returns of income for its fiscal years ended May 31, 1946 and 1947, with the collector of internal revenue at Jacksonville, Fla. Charles J. Ginsberg, a brother of Sydney, hereinafter referred to as Charles, died testate September 22, 1948. Sydney was named executor of his estate in Charles' will *114 and he was duly qualified and served as such from 1948 until 1957. Sydney and Charles were 2 years apart in age and were closely associated in business for many years prior to Charles' death in 1948. They were first associated in business with their father. From 1930 until 1938 Sydney and Charles, as partners, operated an agency for the sale of Ford automobiles in Detroit, Mich., known as Ginsberg Motor Sales. That business was terminated in 1938 and thereafter the brothers started and engaged in a business known as Lincoln Builders, in Detroit, subdividing land and building and selling houses, which continued until 1944. Sydney moved to Miami in 1944 and Charles also moved there about 6 months later. Prior to November 1, 1945, Sydney and Charles obtained a Nash new car dealer's franchise for the city of Miami and on November 1, 1945, formed a partnership known as Nash Miami Motors for the purpose of selling new Nash automobiles. Each brother owned a one-half interest in the partnership, which continued in this business until February 1947. On February 5, 1947, the Nash corporation was organized to take over and operate the partnership business, as of February 1, 1947. The corporation *115 continued to operate the Nash dealership throughout the period here involved. When the Nash corporation was organized, 20 shares of its stock were issued at $1,000 per share, or a total of $20,000. Ten shares of the stock were issued to Charles, 9 shares to Sydney, and 1 share to Daniel Ginsberg, a son of Sydney. Charles was president of the corporation from its inception until his death in 1948; Sydney was secretary and treasurer during this time and succeeded to the presidency on Charles' death, at which time, Sydney's sons, Burton and Daniel, became vice president and treasurer, and secretary, respectively. When the Nash partnership started in business, it occupied a lot on the Venetian Causeway owned by the two partners in behalf of the partnership, which they had acquired at a cost of $35,002.70. Sometime during the first quarter of 1946 a building was constructed on this property by the partnership at a cost of $160,043.38. Construction of the building was financed in part by a $100,000 mortgage on the property dated October 14, 1946. This building was in part a garage and in part an automobile showroom. This property was thereafter used, first by the partnership and thereafter *116 by the corporation, to conduct the automobile dealership business. On or about February 18, 1947, Venetian Realty Corp., hereinafter referred to as Venetian Realty, was organized to, and did, take over the above real estate. The land and building were conveyed to Venetian Realty by Sydney and Charles and their wives, by deed January 31, 1947, recorded May 1, 1947. The consideration for the conveyance was the assumption of the mortgage on the property, having a balance due of $97,500, and the issuance of a promissory note payable to the Nash partnership in the amount of $32,500. Upon its organization, Venetian Realty issued 10 shares of its stock for $1,000 per share, 1 share to each of Charles and Sydney, and 4 shares to each of their wives, who continued to hold this stock throughout the period here involved. After the conveyance of the property to Venetian Realty, Venetian Realty rented the property to the Nash corporation for a rental of $2,500 per month. Issues 1, 2, and 3. Whether the Nash partnership and the Nash corporation failed to include in their gross income a part of the sales price of certain used cars sold to used car dealers and others, and whether, as a result *117 thereof, Sydney understated his income for 1946 and 1947 by failing to include therein his correct distributive share of the partnership net income, and amounts received from the corporation taxable to him as dividends. Findings of Fact The Nash partnership and its successor, the Nash corporation, sometimes hereinafter referred to collectively as Nash, conducted an automobile sales agency in Miami, Fla., during the years 1946-48. While their primary business was selling new Nash automobiles, they also sold used cars taken in trade on the sale of new cars; however, they did not operate a used car sales lot as such. They also sold automobile parts and operated a garage for servicing and repairing automobiles. During the period here involved most of the used cars sold by the partnership and the corporation were sold at wholesale to various used car dealers in the Miami area, and the rest were sold at retail to others, including individuals. The used cars sold to dealers were sold in the condition they were in when acquired, without being cleaned up or repaired by Nash. Due to the scarcity of new cars in the immediate postwar period the demand for new and used cars exceeded the *118 supply. As a result the prices of used cars were somewhat inflated during 1946 and 1947 and dealers in new cars who came into posession of used cars, including Nash, were able to sell the used cars to dealers and others at relatively high prices. This situation eased somewhat in 1948 as the supply of new cars caught up with the demand. Both Sydney and Charles were active in the conduct of the business of the Nash partnership and the Nash corporation. Included among their activities was the selling of new and used cars. Sydney was more active in the seling of new cars and Charles was more active in the selling of used cars; however, both participated in the sale of used cars. One brother or the other, or both, always dealt with the used car dealers and determined the price at which the used cars were sold. When a used car was acquired by Nash as a trade-in on a new car sale, it was assigned a number and an employee in the office of Nash recorded the make of car, model, year, engine number, cost, and other information with respect thereto. When a used car or used cars were sold either Sydney or Charles would give the office manager or bookkeeper a note or oral instructions that used *119 cars assigned such and such numbers had been sold to a named purchaser, and the price for which each car was sold. Checks and/or cash, in the amount of the stated sales prices, were usually left with the bookkeeper. Invoices typed in duplicate were thereupon prepared indicating the cars sold, to whom sold, and the sales prices. The amounts shown on the invoices as the selling prices of the used cars sold were the amounts entered on the respective books of the partnership and the corporation as the selling price of the automobiles sold. The amounts shown on the invoices and recorded on the books of the business as the selling prices of the used cars sold were the amounts reported on the tax returns of the partnership and the corporation as the proceeds from the sale of used cars. The employee who prepared the invoices and made the book entries had no knowledge of the prices at which the cars were sold other than what he or she was told by Sydney or Charles. The duplicates of the invoices were kept by the partnership and the corporation and the originals were usually given or mailed to the purchaser, although such was not always done. During the years in question the partnership and *120 the corporation sold used cars to various used car dealers in the Miami area. The customer to which the greatest number of the cars here involved were sold was R. S. Evans Motors of Florida, Inc., hereinafter referred to as Evans Motors. Evans Motors, together with its 15 or 16 related corporations, claimed to be the biggest used car dealer in the country. In 1945 Evans Motors employed Robert Muir as a salesman, then advanced him first to general manager and later to president in 1946 and 1947. During this period L. P. Evans was also employed by Evans Motors and became president of the company after Muir left. Muir and Evans both engaged in buying and selling used cars for Evans Motors, and they were the only two individuals authorized by Evans Motors to buy used cars for it up until the time Muir's employment was terminated. Shortly after Muir became general manager of Evans Motors, he and L. P. Evans contacted Sydney and Charles in an effort to buy used cars from the partnership. In view of the fact that the Nash Motor Co. had started producing new cars sooner after the war than most other automobile manufacturers, the partnership came into possession of a good number of used *121 cars taken as trade-ins on new car sales. Following a discussion of the matter with the brothers, Sydney and Charles agreed to sell used cars to Evans Motors but only if the purchase price of certain cars was paid partly by check and the remainder in cash. The arrangement agreed upon was that either Muir or Evans would negotiate a price for various used cars with either Sydney or Charles from time to time. Invoices for the cars would then be prepared by Nash reflecting a sales price for each car sold. If the sales prices reflected on the invoices equaled the negotiated price for the cars, the entire amount would be paid by Evans Motors by check. But if the prices reflected on the invoices were less than the negotiated prices, Evans Motors was to pay the amount reflected on the invoice by check and the balance by cash paid to either Sydney or Charles. During the period here involved and until the latter part of 1948, Evans Motors bought a large number of used cars from the Nash partnership and corporation under this arrangement. Some of the cars bought were invoiced to Evans Motors at the negotiated price; some of them in each of the years 1946, 1947, and 1948 were invoiced to Evans *122 Motors at a price lower in amount than the negotiated price. In the latter instances Evans Motors paid the price reflected on the invoices by check made payable to the partnership or the corporation, and paid the balance of the negotiated price to Sydney or Charles, or both, in cash. The sales prices reflected on the invoices were the only amounts recorded in sales on the books of the partnership and the corporation and were the only amounts included in income on the tax returns filed for the partnership and the corporation. In those instances in which the cars purchased from Nash were invoiced at a once lower than the negotiated price, it was necessary for Evans Motors to devise name method to record the full cost of used cars purchased. Two checks were drawn by Evans Motors, one payable to Nash Miami Motors in the amount of the invoice price, and a second check drawn to either Muir, or L. P. Evans, or one of the Evans' controlled corporations to cover the balance of the purchase price. The second check was then cashed by Muir or L. P. Evans and the cash, together with the first check, was delivered to either Sydney or Charles. In those Instances where Muir had negotiated the purchase *123 of the used cars from Nash, Muir made the cash payments to either Sydney or Charles, or both. When L. P. Evans purchased the cars, he dealt with Charles and made the cash payments to Charles. At first the second check was charged by Evans Motors to an account other than leventory, such as entertainment, travel, or advertising. However, when Evans Motors employed a bookkeeper or accountant as internal auditor of the books in about July 1946, he inquired what these charges were for, and when advised that they were a part of the original cost of the cars, he instructed that the checks covering the cash payments be charged to inventory, as were the checks covering the invoice price. This procedure was followed thereafter. The check vouchers for both checks were keyed to each other, reflecting the stock numbers and a description of the cars the checks were used to purchase. Evans Motors also prepared an inventory card for each car purchased which reflected the make, model, and year of the car, the stock number assigned thereto, from whom the car was bought, and the purchase price. Where the purchase price was paid with the proceeds from two checks, the inventory cards usually made reference *124 to both check numbers, which were usually either consecutive or close in number and date. A comparison of the books and records of Evans Motors with those of the Nash partnership and corporation reveals that in a number of instances in each of the years 1946, 1947, and 1948 the cost of specific cars bought by Evans Motors from Nash as recorded on the books of Evans Motors exceeded considerably the sales price of the same cars as recorded on the books of Nash. In late 1947, Muir was released from his employment with Evans Motors for alleged embezzlement of various sums of money from that company. Subsequent to that time Muir organized his own business, A.A. Auto Sales-Rentals, Inc., to buy and sell used cars. A.A.'s main source of supply of used automobiles was the Nash corporation, and from October 1947 through May 1948, Muir purchased various used cars from the Nash corporation on behalf of A.A. With respect to such sales the Nash corporation issued invoices which were less in amount than the agreed upon selling price. In paying for the cars purchased from Nash, A.A. issued its checks payable to Nash in the amount of the invoices and paid the remainder of the selling price in cash. *125 Muir delivered the cash payments to Sydney or to Charles. The Nash corporation recorded on its books and reported on its income tax returns only the selling price shown on the invoices. The business of A.A. Auto Sales-Rentals, Inc., was terminated when it was discovered that Muir had sold automobiles in violation of the terms of trust receipts which had been issued to finance companies to secure loans made to acquire the automobiles. In the latter part of 1948 or early in 1949, and continuing for about a year, during which time the returns of the Nash partnership and corporation were under investigation by respondent's agents, Muir was employed as sales manager of the Nash corporation. His employment was terminated in a dispute with Sydney over a bonus. In 1946 the Nash partnership sold some used cars to Julius Stern, who was engaged in the automobile rental business in Miami. When Stern's employees advised Stern that they had found a suitable used car at the Nash place and had negotiated a price therefor, they also told him he would have to pay the purchase price by check in the amount of the Nash invoice price and the balance in cash. Stern agreed to do this in order to get *126 the cars and also because he felt that the invoice price was considerably less than the cars were worth. On most occasions Stern gave the check and cash to his employees, one of whom was his brother, who delivered them to Nash and picked up the car. On some occasions when Stern felt the purchase price negotiated by his employees was rather high, he would personally look over the automobile and then leave the check and cash in the Nash office. The only amount entered on the books of the Nash partnership as sales and the only amount included in the income reported by the partnership was the sales price shown on the invoices. During the latter part of 1946 the Nash partnership sold 14 or 15 used cars to Jack Wein, doing business as Gem Motor Sales. Wein, often accompanied by his wife, Billie, negotiated most of his purchases of cars with Sydney. When the purchase price was agreed upon, an invoice for part of the negotiated price was issued by Nash. Wein paid the invoice price by check drawn to the partnership and paid the balance of the negotiated price to Sydney in cash. The only amount entered on the books of the Nash partnership as sales and the only amount included in the income *127 reported by the partnership was the sales price shown on the invoices. The invoice prices were usually about 50 percent of the negotiated price. Don D. Reed and Robert E. Gilmore, doing business in partnership as Regil Motors, also bought used cars from the Nash partnership and corporation during the years 1946-48. The purchases were negotiated with either or both of Sydney and Charles. The negotiated purchase prices were paid for with finance company checks and cash. Regil Motors prepared an envelope customarily used by used car dealers, for each car purchased. The title papers and invoices, when received, were placed inside the envelope, and information identifying the car was entered on the face of the envelope. The price paid for the car was written down under the flap of the envelope by the purchaser of the car, and this information was later transferred to the books of Regil Motors. A comparison of the amounts reflected on the books and records of Regil Motors as the purchase price of used cars bought from Nash with the sales prices for those cars recorded on the books and records of the Nash partnership and corporation indicates that in most instances the former were considerably *128 in excess of the latter. C. L. Northcutt, whose wife was employed as office manager by Nash, bought used cars from Nash during 1947 and 1948, both in his individual capacity and as a partner in P. & N. Motors. He dealt almost exclusively with Charles prior to Charles' death, and paid cash for the cars he bought most of the time. He recorded the purchase price of each car on the customary envelope and this was later transferred to his records. After respondent began investigating the returns of the Nash partnership and corporation, Northcutt's wife compared the purchase price of the cars purchased from Nash as shown on Northcutt's books with the sales price of those cars as shown on Nash's books and found that the latter was about 50 percent of the former. The only amount reported as sales by the Nash partnership and corporation on the income tax returns filed by them were the sales prices shown on their books. Edward J. Lennon was employed as a parts salesman by the Nash corporation in 1947 and 1948. He bought a used car from the corporation in 1948 and paid $300 cash for it, at the request of Charles. The sales price of this car was recorded on the books of the Nash corporation *129 as $100 and the latter amount was the only amount included in its income reported on its tax return. In addition to the above-mentioned sales the Nash partnership and the Nash corporation sold used cars to other used car dealers and individuals. In late 1944 or early 1945, Charles and Sydney opened a joint account at the First National Bank of Miami Beach. The account was in the name of "C & S Ginsberg" and remained open until after the death of Charles in September 1948. Sydney made no deposits in the account. After Charles died, the account was divided equally between Charles' estate and Sydney. In its partnership returns of income for the fiscal years ended May 31, 1946 and 1947, the Nash partnership included in gross sales as gross sales of used automobiles only the amounts entered on its books from such sales. In his income tax returns for the calendar years 1946 and 1947 Sydney reported as income from the Nash partnership only the amounts shown as his distributive share of partnership income on the partnership returns for its fiscal years ended May 31, 1946 and 1947, respectively. In its corporation income tax returns for the fiscal years February 1, 1947, through November 30, 1947, and *130 December 1, 1947, through November 30, 1948, the Nash corporation included in gross sales as gross sales of used automobiles only the amounts entered on its books from such sales. Neither of the returns disclosed any distributions by the corporation to its stockholders of any earnings or profits during the respective fiscal years. The only income reported in Sydney's income tax returns for 1947 and 1948 as having been received from the Nash corporation was the sum reported as compensation received from the corporation. In determining the deficiencies involved in docket No. 68316 against Sydney for the calendar years 1946 and 1947, respondents determined that in its partnership returns of income for its fiscal years ended May 31, 1946 and 1947, the Nash partnership had understated sales from used automobiles in the amounts of $12,147.50 and $59,151.50, respectively, and that, accordingly, Sydney's distributive share of partnership net income shown thereon had been understated by one-half of those amounts, or $6,073.75 and $29,575.75, respectively, and that Sydney's distributive share of partnership net income as reported in his income tax returns for 1946 and 1947 had been understated *131 by the latter amounts, respectively. In determining the deficiencies in docket No. 68315 against Nash Miami Motors, Inc., for its fiscal years ended November 30, 1947 and 1948, respondent determined that the Nash corporation understated its income from sales of used automobiles in the amounts of $42,015 and $22,675, respectively. Also, in determining the deficiency for 1947 against Sydney, in docket No. 68316, respondent determined that Sydney received dividends from the Nash corporation which he failed to report on his income tax return for 1947 in the amount of $23,912.50. In its amended answer in docket No. 68316 respondent alleges that the $23,912.50 represents one-half of the unreported sales of the Nash corporation during the calendar year 1947 converted in equal shares by Sydney and Charles to their own use. The Nash partnership kept its books and filed its returns of income for its fiscal years ended May 31, 1946 and 1947, on an accrual basis. The Nash corporation kept its books and filed its income tax returns for its fiscal years ended November 30, 1947 and 1948, on an accrual basis. In its income tax return for its fiscal year ended November 30, 1947, the Nash corporation *132 showed that it had earned surplus and undivided profits in the amount of $24,920.19. In its return for its fiscal year ended November 30, 1948, it showed that it had earned surplus and undivided profits of $74,924.79 at the end of that year. Opinion The question basic to all three of these issues is whether Sydney and Charles Ginsberg, acting in behalf of the Nash partnership and its successor, the Nash corporation, sold used cars at prices greater than reflected on the sales invoices and recorded on the books and tax returns of the partnership and the corporation, the unrecorded portion of the sales prices being received in cash and diverted by Sydney and Charles to their own use. Respondent acknowledges that the partnership and the corporation maintained a complete and regular set of books for their businesses, that the gross sales recorded on the books correctly reflected the amount of sales as shown on the used car sales invoices, and that the partnership and the corporation returns were prepared from the books and records and correctly reported the used car sales as shown therein. But in the course of auditing the partnership and the corporation returns for the years here *133 involved, the suspicions of respondent's agents were aroused by the fact that the markup on so many of the used car sales was exactly $50 so he compared the sales prices reflected on the Nash books with the purchase price reflected on the books of the purchasers of those used cars, and discovered there was often a discrepancy. Upon completion of the investigation by his agents, respondent determined that the partnership had understated its used car sales for its fiscal years ending May 31, 1946 and 1947, by the amounts of $12,147.50 and $59,151.50, respectively, and that the corporation had understated its used car sales for its fiscal years ending November 30, 1947 and 1948, in the amounts of $42,015 and $22,675, respectively. This determination was arrived at by adding to used car sales reported by the Nash partnership and corporation the difference between the sales prices of specific cars as shown on the Nash books and the purchase price paid for the same used cars as shown on the books and records of the purchasers of those cars. Evidence was submitted which revealed the detail supporting respondent's determination. *134 Respondent's determinations are presumed to be correct and the burden of proving that they are erroneous lies on petitioners. Petitioners made no effort to show that respondent's determination of the amount omitted on any particular sale was in error - and such a task would have been difficult indeed unless a second set of books had been kept by the Ginsbergs, which was not likely under the circumstances. Instead, petitioners relied on the books and records of the partnership and the corporation as correctly reflecting their gross sales and attempted to discredit the books and records of the purchasers to show wherein respondent erred. Consequently, unless we conclude that petitioners succeeded in proving that respondent was in error in relying on the books and records and statements of the purchasers to determine the deficiencies, we must approve respondent's determinations as to the amounts involved in these issues. Petitioners produced very little direct evidence on these issues. Their only witness on these issues was Sydney, who testified that neither he nor Charles, nor anyone else acting in behalf of Nash, to his knowledge, ever received more than the invoice price for the sale *135 of used cars by Nash. Sydney's testimony deserves consideration, which it has been given, because he was in a position to know, but the weight to be afforded his testimony must be determined in the light of his self-interest in the proceedings and the directly conflicting testimony of the numerous witnesses produced by respondent. Respondent, who had the burden of proving fraud, offered the testimony of at least seven witnesses who had purchased used cars from Nash during the period here involved, all of whom are mentioned in our Findings of Fact. Muir, Stern, and Billie Wein, whose deceased husband operated Gem Motor Sales, testified that in order to buy used cars from Nash, they were required to pay the invoice price by check, and an additional amount in cash. Muir's testimony is supported by the testimony of L. P. Evans, deceased, given at Sydney's trial for criminal tax evasion. [3] The testimony of these witnesses was also supported by their books and records reflecting the purchase price of the cars. Reed, Gilmore, and Northcutt each testified that they paid cash, and in some instances finance company checks, for cars purchased from Nash and recorded the amounts paid on their *136 records. In each instance the amounts claimed to have been paid by the purchasers exceeded the amounts reflected on the Nash books. Lennon, a former employee of Nash, testified that he bought a used car from the corporation in 1948 for $300, which Charles insisted he pay in cash. The sales price was recorded in the corporate books as $100. After a careful review of all the evidence presented at the trial of this case, we are unable to conclude that respondent's determination that the Nash partnership, for its fiscal years ended May 31, 1946 and 1947, and the Nash corporation, for its fiscal years ended November 30, 1947 and 1948, failed to report sales of used cars in the respective amounts determined by him was erroneous. On the contrary, we think the evidence shows that Charles and Sydney formulated a plan to receive sums in excess of the selling prices recorded on the books of the partnership and the corporation, which they followed throughout the years here involved, which had as its purpose the concealment of such receipts not only from the employees *137 who kept the books of the enterprise but anyone else who might examine the books as well. In reaching this conclusion we have given careful consideration to petitioner's objections to some of the evidence submitted by respondent, particularly the books and records of Evans Motors, and to their attack on the testimony of some of respondent's witnesses, particularly the testimony of Robert Muir. Petitioners centered their attack on the books and records of Evans Motors, with which most of the sales upon which the deficiencies are based were transacted, claiming that because of Muir's character, his self-interest, and previous inconsistent statements made by him, his testimony should not be relied upon, and inasmuch as he was the source of much of the information upon which the entries in the Evans Motors' books were based, those books and records were not to be relied upon either. The books and records of Evans Motors were properly identified by the internal auditor who supervised the keeping of those books and there is no evidence that those books did not correctly reflect the used car purchases based on the information given the bookkeepers by Muir and L. P. Evans. The canceled checks, *138 check vouchers, and inventory cards of Evans Motors were also introduced in evidence to support the books and the testimony of respondent's witnesses. In support of the testimony of the other used car dealers to whom Nash sold cars giving rise to the deficiencies, the envelopes upon which the purchase price and other information was originally recorded by the purchasers were offered in some instances and properly identified. The canceled checks and check stubs of Stern were offered and properly identified by him. Summaries made from those records and sworn to by the witnesses, listing each car purchased from Nash and the amounts paid therefor, most of which were used as evidence in the criminal income tax trial of Sydney [4] and the trial in this Court involving the income tax liability of Charles, hereinafter mentioned, were also offered and identified by the witnesses. We have been cited no grounds which we think justify rejecting any of the documentary evidence admitted, and we deny petitioners' various motions to strike such evidence; but even without such, we think the oral testimony of the witnesses themselves shows a pattern of conduct on the part of Charles and Sydney which *139 proves that the books and records of Nash did not reflect the entire gross sales of used cars. We recognize that by inflating the purchase price of the used cars they resold, the used car dealers might reduce their own taxable profit and that it could have been to their interest to falsify their records and their testimony in this respect. We also recognize that Muir and L. P. Evans could have been using the second check to obtain funds from Evans Motors for their own use. However, we observed Muir and the other witnesses carefully while they were on the witness stand and in our opinion the testimony they gave was credible. It would be impossible to conclude with certainty that all of the cash payments found their way into the hands of Charles and Sydney, but in our view of the evidence presented we cannot find that respondent erred in using the method he used in determining the unreported sales of the Nash enterprises. Petitioners' argument that an analysis of the profit reported by Nash on the sales of used cars was greater than that reported by Evans Motors is entitled to little weight in our opinion. There is evidence that because of the *140 OPA controls on the prices for which new cars could be sold during this period, new car dealers often allowed less on the old car received in trade than would normally have been allowed. This gave them a low cost in the used cars and it would not have been difficult to realize a substantial book profit on these cars by selling them at $50 above cost. Thus Nash could show a fairly good profit percentagewise by recording the sale of used cars at $50 above cost. The books of Nash reflect that this $50 markup was used with rather surprising consistency throughout the period here involved, despite the fact that the used car dealers all testified they negotiated the prices paid for all cars with Sydney or Charles, which Sydney did not deny. Furthermore, it seems rather unlikely that Sydney and Charles, who had been in the automobile business before and presumably knew the market for used cars, would have been satisfied with an average profit of about $50 per used car when the evidence indicates that these cars were being resold by the used car dealers at much higher prices than the prices for which Nash purportedly sold these cars to the dealers. Petitioners have failed to prove that respondent *141 erred in the method he used in determining that the Nash partnership and the Nash corporation understated their sales of used cars, and have failed to prove that he erred in determining the amounts thereof. Respondent's determinations of such amounts are accordingly approved. Since Sydney was an equal partner in the Nash partnership and formulated and participated in a course of conduct whereby he received amounts from the sale of partnership used cars not recorded on the partnership books, we are unable to find that respondent erred in determining that Sydney's distributive share of the partnership income for its fiscal years ended May 31, 1946 and 1947 was understated by one-half of the amounts respondent determined that the partnership sales were understated for those years. Starr v. Commissioner, 267 F. 2d 148 (C.A. 7, 1959). Sydney and Charles were the principal officers and stockholders of the Nash corporation until Charles' death in September 1948, and they dominated and controlled the conduct of its business. They received amounts upon the sale of used cars owned by the corporation which were not reported on the corporation's books or returns. They were *142 acting in behalf of the corporation in making such sales and the entire amounts received were properly income to the corporation. United Dressed Beef Co., 23 T.C. 879 (1955). We find no error in respondent's determination that the corporation understated its sales and income by the amounts stated in the deficiency notice in docket No. 68315. There is no indication in the record nor contention by the petitioners that Sydney and Charles expended these unreported amounts for the benefit of the corporation. Under these circumstances the amounts so received and retained by them constituted taxable dividends to them. Jack M. Chesbro, 21 T.C. 123 (1953), affirmed per curiam 225 F. 2d 674 (C.A. 2, 1955), certiorari denied 350 U.S. 995 (1956). Neither is there any evidence that Sydney and Charles did not share these amounts equally. So despite the fact that Sydney owned only 45 percent of the stock of the corporation while Charles owned 50 percent, we find no error in respondent's determination that 50 percent of the amount which he determined the corporation had failed to report as sales during the calendar year 1947 constituted taxable *143 income to Sydney as dividends in 1947. Issue 4. Whether the Nash partnership was entitled to deductions in arriving at its net income for its fiscal year ended May 31, 1947, for (a) a loss on the sale of partnership real estate; and (b) an adjustment made to its inventory of parts and supplies. (a) Loss on Sale of Partnership Real Estate Findings of Fact As previously set forth in our General Findings of Fact, Sydney and Charles owned, in behalf of the Nash partnership, the lot on the Venetian Causeway occupied by the partnership as its place of business, for which they had paid $35,002.70, and upon which the partnership had constructed a building costing $160,043.38. This property was encumbered by a mortgage in the principal amount of $100,000, upon which there was a balance due on January 31, 1947, of $97,500. By entry on its books, dated January 31, 1947, the Nash partnership wrote down the total cost of the land and building by $65,046.08, or from $195,046.08 to $130,000, by crediting the property account, and by debiting profit and loss in the amount of $63,449.10 and the reserve for depreciation on the building in the amount of $1,596.98. The journal explanation for *144 the foregoing action was as follows: To record loss on building due to increase of labor and material at time of building it. See appraisal figure by Lon Worth Crow. The "appraisal figure" referred to was stated in a letter to Sydney and Charles from Lon Worth Crow, dated February 27, 1947, which read as follows: Referring to your inquiry as to the Stabilized Value on your property at 545 N.E. 15th Street, Miami, Florida, known as the Nash Miami Motors, which you own and are now occupying, it is my opinion that the property has, as of today, a Stabilized Value of $130,000.00 By warranty deed recorded May 1, 1947, the land and building were conveyed by Sydney and Charles, and their wives, to Venetian Realty, a corporation organized on February 18, 1947, the capital stock of which, totaling $10,000, was held 1 share by each of Sydney and Charles, and 4 shares by each of their wives. In consideration of the conveyance, Venetian Realty agreed to assume the mortgage, which then had an unpaid balance of $97,500, and issued a promissory note payable to the Nash partnership in the amount of $32,500. The property was set up on the books of Venetian Realty at a cost of $130,000. Thereafter *145 Venetian Realty rented the property to the Nash corporation for a rental of $2,500 per month. On its partnership return of income for its fiscal year 1947 the partnership reported a loss on the sale of the land and building in the amount of $63,449.10, computed by deducting from a cost of $195,046.08 the sale price of $130,000 and depreciation in the amount of $1,596.98. This loss was reported as a loss on the sale or exchange of property other than capital assets, and the entire amount of the loss was deducted from ordinary income in computing the net income reported by the partnership. This reduced the distributive share of partnership income reported by Sydney on his individual return for 1947 by $31,724.55. Respondent disallowed the deduction on the partnership return and determined that Sydney's distributive share of the partnership income should be increased by $31,724.55 as a result thereof. Opinion It is difficult to determine petitioner's exact position on this issue. He presented no evidence on the issue except the letter from Crow referred to in our Findings of Fact and the testimony of Lyndon C. Conlon, a CPA who was employed in December 1948 to audit the books of *146 the Nash enterprises. Crow was apparently deceased at the time of this trial. His letter was received in evidence over respondent's objection only to show that such a letter had been received, not as proof of the value of the land and building as of the date thereof. The letter alone was clearly inadmissible to prove value, and petitioner offered no other witnesses to prove value. Conlon testified that he had verified the cost of the property from the books of the partnership and that the books reflected the writedown of the property as set forth in our Findings of Fact. No evidence was offered as to the circumstances under which the property was written down on the books of the partnership or as to the circumstances under which the property was transferred to Venetian Realty, a corporation owned by the partners and their wives, for considerably less than its adjusted cost. Based on this lack of evidence alone we would have to conclude that petitioner has failed to carry his burden of proving that respondent erred in disallowing this loss to the partnership and concomitantly increasing Sydney's distributive share of the partnership income by one-half thereof. Petitioner takes the *147 position on brief that because section 24(b)(1) of the 1939 Code does not specifically disallow a loss on the sale or exchange of property between a partnership and a corporation, this loss should not be disallowed. This Court rejected that argument in Fritz Busche, 23 T.C. 709 (1955), affirmed per curiam 229 F. 2d 437 (C.A. 5, 1956), concluding that the sale by a partnership to a controlled corporation was a sale by the partners and that section 24(b)(1) was applicable. Respondent also claims that the sale was not a bona fide sale at arm's-length, and that the loss should not be allowed for that reason. On the evidence we have before us this argument would appear to have validity. We have no explanation why the partnership would sell property in an arm's-length transaction for $130,000 when the property had cost it $195,046.08 less than a year earlier. And if the property was worth only $130,000 in 1947, we question that Sydney and Charles would have agreed in an arm's-length transaction to have their corporation pay rent of $2,500 per month, or $30,00 per year. We find no error in respondent's determination on this issue. [5]
*148 (b) Inventory Adjustments Findings of Fact As of February 1, 1947, the Nash corporation succeeded the Nash partnership in the operation of the Nash dealership and as of that date acquired the automobile parts and other items of inventory which the partnership then had on hand. No physical inventory of the parts and other inventory items appears to have been taken by either the partnership or the corporation. However, the partnership caused a spot check to be made of certain items of inventory. As of January 31, 1947, certain of the partnership inventory accounts were written down on its books and charged to profit and loss in the total amount of $7,229.95. The following partnership accounts were credited with the amounts indicated: Parts inventory
$5,129.37
Accessories inventory
1,440.04
Gas, oil and grease inventory
79.45
Paint materials inventory
581.09 The entry was explained on the books as follows: [6]
To compute for shortages, breakage, deteriorating, etc. inventory appraised at 60 per cent of value per audit Mr. Ranier. *149 In its returns of income for its fiscal years 1946 and 1947, the partnership stated that its inventories were valued at the "Lower of Cost or Market." Respondent disallowed the above-claimed losses in determining the partnership net income for its fiscal year ended May 31, 1947, and increased Sydney's distributive share of the partnership net income for 1947 by one-half of the above amount, or $3,614.98. Breakages in the parts and accessories inventories and shortages in the parts, accessories, gas, oil, and grease, and paint materials inventories of the partnership amounted to $1,000 in its fiscal year 1947. Opinion The only evidence offered on this issue, other than the general ledger entries showing the credits to the various inventory accounts and the debit to the profit and loss account, was the testimony of Conlon, the CPA who was employed in December 1948 to audit the books of the Nash corporation. Conlon testified that in the course of his audit he noticed the above entries and upon inquiry with respect thereto found no evidence that a physical inventory had been taken but was advised that the partnership had caused a spot check to be made of the various parts and *150 supplies inventory and that the writedown was made partly as a result thereof and partly because it was customary in the automobile business to reevaluate parts inventories periodically as newer models of cars were marketed. Conlon also testified that this method of marking down parts inventories was customary in automobile business accounting. On this evidence alone we do not think petitioner has carried his burden of proving that respondent erred in disallowing this loss to the partnership and increasing Sydney's share of partnership income accordingly. We have no evidence of the actual value of the inventories as of January 31, 1947, or why it was decided to mark them down approximately 40 percent. Conlon, who was not employed by the Nash corporation until December 1948, had no personal knowledge of why the entries were made or the justification therefor. While Conlon testified that Nash had consistently followed this practice of marking down its parts inventory a certain percentage each year, we believe his testimony referred to the years subsequent to the time he was employed to audit the books of the Nash corporation and prepare its returns. The partnership general ledger for *151 these inventory accounts for the period ended May 31, 1946, reflects no similar markdown of these inventories. On brief respondent states that on the basis of this Court's decision in Estate of Charles J. Ginsberg, T.C. Memo. 1958-95, affd. 271 F. 2d 511 (C.A. 5, 1959), on this issue he would be agreeable to allowing the partnership a deduction of $1,000 for breakage of parts and shortages of supplies as found by this Court in the earlier case. Despite the paucity of evidence supporting such a conclusion in this record, we have nevertheless found that the partnership did suffer some loss in its inventory accounts from breakages and shortages, and have fixed the amount at $1,000, consistent with the earlier case and respondent's position announced on brief. Sydney's distributive share of the partnership net income was understated on his 1947 return by the amount of $3,114.98 because of the inventory adjustment made by the partnership. Issues 5 and 6. Fraud and the Statute of Limitations Findings of Fact Reference is made to our Findings of Fact on Issues 1, 2, and 3, in connection with the fraud issue. Sydney and Charles were the sole partners *152 of the Nash partnership, and were the principal officers and stockholders of the Nash corporation. They jointly controlled the affairs and dictated the policies of both the partnership and the corporation. The partnership and the corporation, which were primarily in the business of selling new Nash automobiles, received used cars as trade-ins on the new cars sold. Most of the used cars were sold to used car dealers in the Miami area and others were sold to individuals. Sydney and Charles, at times jointly, and at times individually, negotiated the sales of the used cars and determined the prices for which they were sold. Because of the shortage of automobiles in the postwar period, they were able to demand inflated prices for the used cars. In transactions with some of the used car dealers, Sydney and Charles required the purchasing dealer to pay the invoice price for the cars purchased by check made payable to Nash and to pay the balance of the negotiated price to them in cash. Other dealers paid the entire negotiated price to Sydney and/or Charles in cash, irrespective of the price stated on the invoices issued by Nash. Sydney and Charles told the company bookkeeper how much to *153 issue the invoices for on cars they sold. The price was often considerably less than the negotiated sales prices actually received by Sydney and Charles for the cars sold. The bookkeeper, having no independent knowledge of the prices for which the used cars were sold, issued the invoices in the amounts instructed by Sydney and Charles and gave the original of the invoice to the purchaser if he wanted it and kept a copy for the Nash files. Only the amounts shown on the invoices were entered as gross sales on the Nash books. The tax returns for both the partnership and the corporation were prepared from the books and reported as gross sales only the invoice prices of used cars sold. Sydney and Charles retained the excess of the cash received over the invoice prices for their own use and did not use it for partnership or corporate purposes. The unrecorded payments received by Sydney were not included in the income reported on the income tax returns of either Sydney or the partnership or the corporation. Sydney was indicted under section 145(b) for evasion of his individual income taxes for the years 1946, 1947, and 1948, and as an officer of the Nash corporation for evasion of the *154 corporation's income tax for its fiscal years 1947 and 1948. He was found not guilty of personal income tax evasion for the years 1946 and 1947 and guilty on the other charges. On appeal, the convictions were reversed for errors in evidence. Thereafter, Sydney entered a plea of nolo contendere to evasion of the corporation's taxes for 1948, and the other charges were not pressed. Sydney's individual income tax return for the years 1946 and 1947 were filed on or about March 15, 1947 and 1948, respectively. Sydney executed a consent extending the period of limitation for assessment of his income taxes for the years 1946 and 1947 to June 30, 1953. No other such extensions were executed by Sydney. The statutory notice of deficiency in docket No. 68316 was mailed by respondent to Sydney on March 27, 1963. The Nash corporation filed corporation income tax returns for its fiscal years ended November 30, 1947 and 1948, on or about February 15, 1948 and 1949, respectively. Sydney, in behalf of the Nash corporation, executed a consent extending the period of limitation for assessment of the corporation's income tax for its fiscal years 1947 and 1948 to June 30, 1953. No other such extensions *155 were executed by the Nash corporation. The statutory notice of deficiency in docket No. 68315 was mailed by respondent to the Nash corporation on March 27, 1957. A part of the deficiencies in Sydney's income taxes for both of the years 1946 and 1947 was due to fraud with intent to evade tax. Sydney's income tax returns for both 1946 and 1947 were false or fraudulent with intent to evade tax. A part of the deficiencies in the Nash corporation's income taxes for its fiscal years ended November 30, 1947 and 1948, was due to fraud with intent to evade tax. The Nash corporation's income tax returns for both of its fiscal years 1947 and 1948 were false or fraudulent with intent to evade tax. Opinion Assessment and collection of any deficiencies in the income taxes of Sydney for the years 1946 and 1947 and of the Nash corporation for its fiscal years 1947 and 1948 is barred by the statute of limitations unless the returns were false or fraudulent with intent to evade tax. Sec. 276(a), I.R.C. 1939. The burden of proving fraud is on respondent and he must prove it by clear and convincing evidence. *156 L. Glenn Switzer, 20 T.C. 759 (1953). We find that respondent has carried that burden with respect to both petitioners. The evidence is clear and convincing that Sydney and Charles jointly devised a plan for reporting and recording the sales of used cars so that the full amount of the sales prices of some of the used cars sold was not revealed to the bookkeepers of the partnership and the corporation and consequently a part of the sales prices of those cars was never included in gross sales recorded on the books of the partnership or the corporation and was not included in the income reported on their tax returns or the returns of the partners. Both Sydney and Charles were aware of this fact and both participated in this course of conduct which could only have had as its principal purpose the evasion of payment of income tax on the full income of the corporation and the partners. Our discussion of the evidence under Issues 1, 2, and 3 reflects our reasons for concluding that both Sydney and Charles participated in this plan, and no reason other than tax evasion is advanced, nor can we envision one, for pursuing this course of conduct. As a result of their conduct, *157 the books and records of the partnership and the corporation failed to reflect all the income from the business, and the income tax returns of both the individual partners and stockholders and the corporation, based thereon, were false and fraudulent. Sydney's at times somewhat obscure effort to cast the entire blame for any wrongdoing on his deceased brother Charles at the trial of this case is supported by neither the record nor the credulity of the trial judge. While the evidence does indicate that Charles was more active in the sales of used cars than was Sydney, the unimpeached testimony of several of respondent's witnesses clearly proves that some of the excess cash payments were made to Sydney alone and to Sydney and Charles jointly. Furthermore, we cannot believe that one of these two brothers, who had been closely associated in business all their lives, would have attempted to or could have engaged in such a course of conduct without the other brother knowing about it and receiving his share of the benefits from it. There is no evidence that Sydney did not share equally with Charles in all profits from the business. Petitioners based their defense on the fraud issue almost *158 entirely on an effort to discredit the testimony of Robert Muir and the books and records of Evans Motors. But even had they succeeded this would have left unimpeached the direct testimony of Stern and Wein that they were required to and did make cash payments in excess of the invoice prices in order to buy cars from Nash, and the undisputed fact that the books and records of various other used car dealers show that they paid more for the used cars purchased from Nash than was recorded in sales on the books of Nash. It matters not on this issue that all of the excess cash may not have reached the hands of Sydney or Charles - if any part of the deficiency is proven to be due to fraud with intent to evade tax, the addition to tax under section 293(b), I.R.C. 1939, applies to the entire deficiency. Ginsberg's Estate v. Commissioner, 271 F. 2d 511 (C.A. 5, 1959). Sydney and Charles were the owners of practically all the stock of the Nash corporation, were its principal officers, and controlled the conduct of its business, its policies, and its bookkeeping. Sydney and Charles both *159 signed the income tax returns of the corporation for its fiscal year 1947, and Sydney signed the 1948 return as president of the corporation. Under the circumstances the intent of these two officers and stockholders and their actions in behalf of the corporation are to be imputed to the corporation. Auerbach Shoe Co., 21 T.C. 191 (1953), affd. 216 F. 2d 693 (C.A. 1, 1954). The facts in this case permit of no other conclusion than that the corporation's income tax returns for its fiscal years 1947 and 1948 were fraudulently filed with the intention of evading tax. Our finding of fact that a part of the deficiencies in income tax of both Sydney and the corporation for the tax years involved were due to fraud with intent to evade tax requires the application of the 50-percent addition to tax under section 293(b), and respondent is sustained on this issue. Our finding of fact that the returns of both Sydney and the corporation for the years involved were fraudulent with intent to evade tax lifts the bar of the statute of limitations under section 276(a), and assessment of the deficiencies found to be due is not barred. Issue 7. Whether a Judge of the *160 Tax Court is Qualified to Determine the Issues. Opinion In reply to respondent's second amended answer, petitioner Nash Miami Motors, Inc., alleges - that none of the Judges of the Tax Court of the United States, as the same is now constituted, are qualified to hear and determine the issues raised in the second amended answer in that all of said judges were or have been appointed for a term of years, contrary to Article III, Section One of the Constitution, wherein it is provided that all judges of the Supreme Court and inferior courts shall hold their offices during good behavior. However appealing petitioner's argument that the judges of this Court must be appointed for a term of good behavior at irreducible salaries may be to the individual judges of this Court, we do not believe this argument can be of any aid to petitioner in this Court. The Tax Court of the United States was originally established by an act of Congress in 1924 (43 Stat. 336) as the Board of Tax Appeals to permit taxpayers to secure a determination of tax liability before payment of the deficiency. It is still *161 the only forum available to taxpayers for that purpose. Flora v. United States, 362 U.S. 145 (1960). Provisions with respect to its status, jurisdiction, and personnel are now contained in section 7441, et seq., I.R.C. 1954. [7]
*162 Petitioner elected to invoke the jurisdiction of the Tax Court for a redetermination of its tax liabilities rather than pay the deficiency first and sue for refund in either a United States District Court or the Court of Claims. Just prior to the trial of this case petitioner also filed a complaint in the United States District Court for the Southern District of Florida against the United States, the Attorney General, and the Commissioner of Internal Revenue seeking to enjoin this Court from proceeding with this trial unless the trial be heard by a judge appointed for a term of his good behavior as provided by the Constitution. Nash Miami Motors, Inc. v. United States, an unreported case (S.D.Fla. 1963). That complaint was dismissed by order of the court for lack of jurisdiction, which order of dismissal is now pending on appeal in the United States Court of Appeals for the Fifth Circuit. In Henry Cappellini, 14 B.T.A. 1269 (1929), the Board of Tax Appeals refused to consider the constitutionality of an act under which the taxpayer had invoked the jurisdiction of the Board under the well-settled rule that *163 one who invokes jurisdiction submits to it, and having submitted to it, waives all right to interpose any objection; and the equally well-settled rule that one cannot take advantage of a statute and then question its constitutionality. See also F. L. Bateman, 34 B.T.A. 351 (1936). We think the rules applied in those cases, and the authorities cited therein, are applicable here to prevent petitioner from successfully challenging the qualifications of a judge of this Court to determine the issues raised by the pleadings in this case. [8]
*164 We assume that petitioner raised this constitutional question in his reply to the affirmative issue of fraud pleaded by respondent in his answer to in some way avoid the arguments of waiver and estoppel. Having once waived the right to challenge the jurisdiction of this Court, petitioner waived that right with respect to all issues that are properly before the Court in this proceeding. See United States v. Shepard's Estate, 196 F. Supp. 281 (N.D.N.Y. 1961). Decision will be entered under Rule 50. Footnotes
1. Daniel L. Ginsberg is also counsel of record in Docket No. 68316.↩
2. All statutory references are to the Internal Revenue Code of 1939 unless otherwise indicated.↩
3. United States v. Ginsberg, an unreported case (S.D. Fla. 1958), reversed and remanded 257 F. 2d 950↩ (1958).
4. See infra under fraud issue.↩
5. In Estate of Charles J. Ginsberg, T.C. Memo. 1958-95, affd. 271 F. 2d 511 (C.A. 5, 1959), this Court found that the same conveyance with which we are concerned here was not an arm's length transaction, that the evidence would not permit a finding that $130,000 correctly reflected the value of the property at the time of the convenyance or that the partnership suffered a loss, and sustained respondent's disallowance of the loss. Petitioners apparently presented more evidence on this issue at the trial of that case than was presented here - but the Court still disallowed the loss. That case involved the income tax liability of Charles Ginsberg for the years 1946 and 1947 based on most of the same transactions with which we are concerned here. However, because the taxpayers here are different parties than the taxpayer there, and because most of the issues involved here are factual, we have been very careful to consider the issues presentaed here only on the record made in this case. If some of our findings and conclusions here are the same or similar to our findings and conclusions in that case, it is only because in our opinion the record presented in this case supports such findings and conclusions. On this issue and the next issue, however, the real party involved, the partnership, was the same in both cases and we would find it difficult to reach a conclusion on those issues here contrary to those reached in the Estate of Charles J. Ginsberg case, particularly where there appears to have been more evidence offered by petitioners on those issues in the earlier case than was presented here.↩
6. This explanatory entry was requested as a finding of fact by both parties and also appears as a finding of fact in the Memorandum Opinion of this Court in the Estate of Charles J. Ginsberg case previously referred to, but we find no evidence in the record of this case to specifically support it.↩
7. SEC. 7441. STATUS. The Board of Tax Appeals shall be continued as an independent agency in the Executive Branch of the Government, and shall be known as the Tax Court of the United States. The members thereof shall be known as the chief judge and the judges of the Tax Court. * * *
SEC. 7443. MEMBERSHIP. * * *
(e) Term of Office. - The terms of office of all judges of the Tax Court shall expire 12 years after the expiration of the terms for which their predecessors were appointed; but any judge appointed to fill a vacancy occurring prior to the expiration of the term for which his predecessor was appointed shall be appointed only for the unexpired term of his predecessor. (f) Removal from Office. - Judges of the Tax Court may be removed by the President, after notice and opportunity for public hearing, for inefficiency, neglect of duty, or malfeasance in office, but for no other cause.↩
8. If the judges of this Court are not qualified to determine the issues of tax liability and fraud raised herein, it would seem to follow that we are no more qualified to determine the constitutional issue raised by petitioner. Furthermore, if the judges of this Court are not qualified to redetermine petitioner's tax liability, petitioner would appear to be left without remedy except to pay the tax and sue for refund. The Tax Court was created by Congress. Petitioner cannot force Congress to provide what petitioner considers to be a validly constituted court. See Willmut Gas & Oil Company v. Fly, 322 F. 2d 301 (C.A. 5, 1963), certiorari denied 375 U.S. 984↩ (1964).